Filed 3/27/23  P. v. Morgan CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B315231 |
| Plaintiff and Respondent, | Los Angeles County |
| v. | Super. Ct. No. TA146151 |
| DEAN MORGAN et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County, Kelvin D. Filer, Judge. Affirmed as modified.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant Dean Morgan.

Jean Ballantine and Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant Gerod Harrison.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, David E. Madeo and Marc A. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

A jury convicted defendants Dean Morgan and Gerod Harrison of first degree murder (count 1). The jury also convicted Morgan of possession of firearm by felon (count 2) and unlawful possession of ammunition (count 3). As to count 1, the jury found firearm allegations true as to Morgan and found true the allegation that Harrison personally used a deadly and dangerous weapon.

Defendants contend that the evidence was insufficient to support that they premeditated and deliberated the murder and raise various claims of prosecutorial misconduct. Morgan also argues that the court erred in failing to instruct the jury on the lesser included offense of voluntary manslaughter based on heat of passion and in failing to instruct the jury that provocation could negate premeditation and deliberation. He further contends that counts 1, 2, and 3 were part of the same course of conduct, that the sentences on counts 2 and 3 violate Penal Code[1] section 654, and that we must remand for resentencing. Finally, he argues that he should receive one additional day of actual presentence custody credit.

We modify Morgan's judgment to reflect that his sentence on count 3 for unlawful possession of ammunition is stayed pursuant to section 654 and to reflect an award of 1,210 days of actual presentence custody credit rather than 1,209 days. We otherwise affirm both judgments.

---

[1] All undesignated statutory references are to the Penal Code.

# PROCEDURAL  BACKGROUND

An information dated October 23, 2018, charged Morgan and Harrison with the murder of Albert Kyle (§ 187, subd. (a); count 1). As to count 1, it was further alleged that Morgan personally and intentionally discharged a firearm, which caused great bodily injury and death to Kyle (§ 12022.53, subd. (d)), and that he personally and intentionally discharged a firearm and personally used a firearm (§ 12022.53, subds. (b), (c)), which caused count 1 to be a serious felony (§ 1192.7, subd. (c)(8)) and a violent felony (§ 667.5, subd. (c)(8)). It was also alleged that Harrison personally used a deadly and dangerous weapon (§ 12022, subd. (b)(1)), which caused the offense to be a serious felony (§ 1192.7, subd. (c)(8)) and a violent felony (§ 667.5, subd. (c)(8)). Additionally, Morgan was charged with possession of firearm by felon (§ 29800, subd. (a)(1)); count 2), and unlawful possession of ammunition (§ 30305, subd. (a)(1; count 3).

Morgan and Harrison pleaded not guilty and denied all allegations.

A jury found Morgan and Harrison guilty of first degree murder and found all allegations true. The jury also found Morgan guilty of possession of a firearm by a felon and unlawful possession of ammunition.

On count 1, the court sentenced Morgan to 25 years to life plus 10 years for the firearm enhancement. On counts 2 and 3, the court sentenced Morgan to the middle term of two years, to run concurrently, for a total state prison commitment of 35 years to life. The court sentenced Harrison to 26 years to life plus five years consecutive for a prior offense, for a total state prison commitment of 31 years to life.

# FACTUAL BACKGROUND

## 1. Prosecution Evidence

### 1.1. Crystal Lozoya

In May of 2018, Crystal Lozoya lived in an apartment at 10700 South Main Street with her husband and children. On the afternoon of May 26, 2018, Lozoya heard a fight break out in the unit below hers. Her unit began to shake and she heard doors slamming and things being thrown around. She and her children went to look outside and, after stepping down onto the first step of the stairwell and leaning over the balcony, Lozoya observed blood in the doorway of the apartment below.

Lozoya was returning to her apartment with her children when she observed a man with no shirt on, covered in blood, exit the apartment. The bloodied man was stumbling and swaying. While she was closing her screen door, she observed another man follow the bloodied man out towards the front gate of the apartment building. The second man was holding a gun in his right hand with his arm extended. Lozoya was closing the solid wood door to her apartment when she saw the second man shoot at the injured man. She observed the injured man collapsing. After she closed the door, she heard between three and five additional shots. She testified that both the injured man and the man with the gun were African American. Lozoya hid with her children at the back of her apartment and called the police before returning to the front of the apartment to look out the window. She observed the injured man on the ground. Lozoya did not hear any gunshots before the injured man was walking towards the street and did not observe the injured man turn around to face

4

the man with the gun. The man with the gun fired at the injured man's back.

Lozoya also observed the man with the gun holding an object in his left hand. She testified that she could not tell what it was, but later testified that she remembered that it was a bag of some kind.

### 1.2. Marvin Tart

On May 26, 2018, Marvin Tart was in an apartment at 10700 South Main Street, where he had been living for several months. Different people lived in the unit during that period, including Albert Kyle, whom Tart knew as "Tap." Tart was part of the Main Street Gang, but was no longer active, and did not know whether Kyle had any gang affiliation.

Tart and Kyle were the only two people in the apartment. Before Tart went to sleep in one of the bedrooms, he observed Kyle lying on the couch in the living room. Tart was woken up by a commotion and the sound of people fighting. Tart stuck his head out of the bedroom and observed blood all over Kyle and on the floor. Kyle looked at Tart, frightened. Tart initially testified that he could not tell who Kyle was fighting with since he could only see the back of their head. He heard male voices and therefore believed the attacker was male.

Tart returned to the bedroom and sat there for a moment. He then heard gunshots and hopped out the window to try and get away. Tart ran to the back of the apartment complex and opened the gate to the parking lot, but saw no way of getting out. He returned to the apartment and re-entered through the window. After putting on his shoes and his jacket, he exited through the window again and headed towards the front gate of the apartment complex, where he observed Kyle on the ground.

Tart walked away but later returned to the apartment complex to make sure the police knew he had nothing to do with the crime. He told an officer that he had not seen anything.

Tart had several past felony convictions, including for burglary, possession of a firearm, and, most recently, vehicle theft. When he was first arrested for the vehicle theft, detectives spoke with Tart and he denied knowing anything about this case. After he was in custody for several weeks, Tart spoke again with detectives and informed them that he saw what happened inside the apartment. He told a detective that he was in the apartment during the incident and that men told him "to go to the front while they handle their business." Tart further told the detective that he hid in a closet while the men were getting ready to leave. He told the detective that Morgan had shot Kyle, and said the other man present was "Deuce" from the Broadways gang, whom he later identified as Harrison. He also stated that he heard one of them say, "Shoot this motherfucker. Don't let him out."

Although Tart identified Morgan and Harrison to detectives as the individuals who had committed the murder, he initially testified that he identified them based on what he heard from the streets and not his own observation of them in the apartment. However, he later stated that he saw Morgan and Harrison in the apartment and observed them fighting with Kyle. He testified that he saw Kyle's shirt mangled and then, while hiding in the closet in the bedroom, saw them exit through the bedroom window. He did not observe anyone else in the apartment. He told the detective that Morgan was the shooter because it looked like Morgan had something in his hand when he was leaving the apartment. Although Tart had taken drugs

not long before the incident took place, he denied having hallucinated any of the events he testified to. [2]

### 1.3. The Investigation

10700 South Main Street is across the street from a police station. After receiving a report of the incident, officers arrived within approximately a minute and observed Kyle lying face down on the street. Officers further observed a trail of blood leading to the apartment complex and, once they entered the gate, observed a large pool of blood near Kyle's unit. While inspecting the exterior of the apartment, officers identified firearm casings in the grass at the front of the apartment building and discovered a firearm in the back parking lot.

Officers also canvassed the area for suspects. They located Morgan sitting on the porch of a home, looking "a little bit nervous, kind of hyperventilating" and with "bloodstains on his shirt." Morgan was unarmed and complied with the officers' commands. Later, officers located Harrison, who was wearing a light gray shirt covered in blood. Harrison ran from the officers for a short distance and did not comply with their orders. After several minutes, officers were able to detain Harrison, who had a

---

[2] After Tart's arrest in the vehicle theft case, he worked as an informant with the Los Angeles Police Department and conducted controlled drug purchases. During the last drug buy he conducted for the Department, Tart failed to return an ounce of methamphetamine when the seller gave Tart an ounce more than the Department paid him to purchase. He admitted this to the Department when confronted. The District Attorney did not promise Tart anything in exchange for his cooperation in the case. However, the parties stipulated that Tart received $288 pursuant to the California Witness Relocation and Assistance Program.

laceration to his right hand that was bleeding. Harrison was "sweaty, nervous, out of breath, and upset." Officers recovered a folding knife from his front left pocket.

Later that evening, the investigating detectives, Pat Flaherty and Rene Castro, conducted a recorded interview of Morgan at the station. Morgan waived his *Miranda*[3] rights and agreed to speak with the officers. He told the detectives that he had a backpack with him that he ditched in a sewage area. The detectives conveyed this information to officers, who recovered the backpack from a storm drain near the apartment building. The backpack had red or brown stains on it. There were several items inside the backpack, including a jacket, some shirts, jeans that were the same brand as Morgan was wearing, and a folding knife.

The detectives also booked into evidence the clothes the defendants were wearing that day. The t-shirt worn by Morgan had bloodstains, as did his shoes and his jeans. Morgan had no injuries. The shirt worn by Harrison was covered in blood and shoes worn by Harrison had blood on the outer sole and bottom. Harrison had injuries above and below the left elbow, an injury to his right hand, and bruising around his right elbow. He also had dried blood under his fingernails.

The following day, the detectives spoke with Lozoya and showed her a picture of the backpack officers had recovered, which she identified as the bag the shooter was holding during the incident. Based on their investigation, the detectives found no evidence that anyone other than Kyle, Morgan, Harrison and Tart was present in the apartment at the time of the incident.

---

[3] *Miranda v. Arizona* (1966) 384 U.S. 436.

## 1.4. Physical Evidence

Andreh Aghajanian, a criminalist employed by the Los Angeles Police Department and assigned to the Field Investigation Unit, responded to the scene on the evening of May 26, 2018. Aghajanian collected four discharged cartridge cases and booked them into evidence. He also observed red stains on the sidewalk outside the apartment and inside the residence on the floor and furniture in the living area, the floor of the hallway, and the doorknob to the hallway closet. Aghajanian collected samples from the reddish stains throughout the apartment and booked those samples into evidence. He also examined the exterior of the apartment and the parking lot. Aghajanian collected samples from two additional reddish stains at the exterior of the apartment. He also booked the gun from the parking lot into evidence. The gun had four live rounds in it.

Huan Nguyen, a criminalist employed by the Los Angeles Police Department and assigned to the Forensic Science Division, Serology DNA Unit, conducted testing on certain of the samples to determine whether they contained blood. Nguyen tested the defendants' shoes and clothes, a shirt from the backpack, the backpack, the knife recovered from Harrison, and the gun recovered from the parking lot for indications of blood and, upon obtaining positive results, prepared swabs or cut samples from the items and sent the swabs and samples for DNA testing. Nguyen also swabbed the gun for touch DNA and swabbed the shoes, backpack, and clothes for wearer DNA and submitted samples for testing.

Robert Broderick, who was also assigned to the Serology DNA Unit, analyzed the results of DNA testing on the samples prepared by Nguyen. He determined that the sample taken from

the hooded shirt was consistent with Harrison's DNA and that the sample taken from Harrison's shoes contained a mixture of two individuals' DNA and was consistent with the DNA of Harrison and Kyle. Broderick further determined that the DNA taken from the blood stain on the backpack matched Kyle's DNA. The DNA profile of the blood stain on the shirt from the backpack was consistent with three contributors, one of which was Harrison. The other contributors could not be determined. The blood stains on Morgan's left shoe contained DNA consistent with two male contributors, one of which was Kyle, and the right shoe contained DNA consistent with at least three male contributors who could not be identified. Broderick further determined that the blood sample taken from Harrison's knife matched Kyle's DNA, and that the blood sample from the gun contained DNA consistent with two male contributors, one of which matched Kyle and the other of which could not be determined. The DNA swab from the gun handle was inconclusive.

Fadil Biraimah, a criminalist employed by the Los Angeles Police Department and assigned to the Firearm Analysis Unit, compared the discharged cartridge cases found in front of the apartment to the gun recovered at the scene. Biraimah concluded that three of the four casings were fired by the recovered gun. The remaining casing was inconclusive, though it had similar configurations of marking as the test casings.

### 1.5. Medical Testimony

Dr. Scott Luzi, a forensic pathologist, performed the autopsy and prepared an autopsy report. Dr. Luzi identified a total of five gunshot wounds and 16 sharp force wounds on Kyle, the latter of which were a combination of stab and incised wounds. Of these wounds, one gunshot wound was fatal and four

of the stab wounds were independently fatal. The fatal gunshot entered through the upper left back and had an up to downward trajectory Dr. Luzi did not observe any soot or stippling from the gunshot on Kyle, which suggested that he was shot from a distance of more than three feet. The fatal sharp force wounds were inflicted to Kyle's lower left chest, upper right back, and lower middle back. Dr. Luzi testified that four of the gunshot wounds indicate that two bullets entered and exited on the same side of the chest, which he stated would be consistent with the victim being shot while lying on his stomach and rolling towards the left. Dr. Luzi further testified that the incision wound to Kyle's right palm and the abrasions on his right arm were consistent with defensive injuries.

## 2.    Harrison's Evidence

Harrison testified on his own behalf. He was a member of the Broadway gang, which he joined when he was 13 years old. Harrison had previously been convicted of carjacking in 2005, a crime for which he was on parole at the time of trial. Kyle, whom Harrison referred to as "Tap," was Harrison's gang uncle and had been since he was a kid.

On the day of the incident, Harrison was at a hamburger stand when he observed Morgan walking down the street. Morgan said he was going to Tap's place and Harrison joined him. The apartment door was open and Harrison entered first, followed by Morgan. Kyle was walking from the hallway to the living room when he saw Harrison and Morgan, and asked Harrison who Morgan was. After Harrison vouched for Morgan, Kyle told Morgan to sit down. Harrison testified that Tart, whom he called "Midnight," was also present and that there was somebody else in the back. Harrison did not know who the other

11

man was but recognized him from the neighborhood and said he was from another gang. The man was African American, with dark skin and braids, and was around 6 feet 1 inch tall and 200 to 220 pounds. Harrison was 5 feet 4 inches tall and weighed 140 pounds.

Kyle went back to the hallway, where a commotion erupted. Harrison heard someone being slammed against a wall. Harrison went to see what was happening and saw Kyle fighting with the unknown man. They were initially grappling, but Harrison noticed that the unknown man had a knife. The man began stabbing Kyle, who was holding onto the man's shirt. Harrison went to help Kyle and grabbed the attacker's hand. Harrison sliced his hand while attempting to hold the attacker back. Harrison also sustained additional cuts and puncture wounds.

Kyle grabbed onto Harrison as Harrison was trying to defend him and they stumbled into different furniture items in the living room. Tart was also present in the living room. The unknown man dropped the knife and Harrison picked it up and put it in his pocket. Everyone then ran out of the apartment. The unknown man ran towards the front gate. Harrison was the third person to exit the apartment and heard shots when he got to the door. He ran to the back of the apartment complex, towards the parking area, and hopped the fence. He ended up at another house and asked the people there to call the police, but was unsure whether they did so, as he passed out.

During the fight, there was a gun on the table, but Harrison never saw anyone pick it up and did not see who fired it. Harrison did not see what Morgan did after the fight began.

During cross examination, the prosecutor asked why Harrison and Morgan went to Kyle's apartment. Harrison

testified that they intended to buy weed. The prosecutor introduced a photograph showing the contents of Harrison's wallet when he was arrested, which contained only $1. The prosecutor also asked Harrison whether Morgan had a backpack on him that day. Harrison resisted answering the question but agreed that, when Detective Flaherty had showed him a picture of the backpack at the police station, he had stated that it was Morgan's and that Morgan had it with him that day.

### 3. Morgan's Evidence

Morgan also testified on his own behalf. Morgan lived in South Central his whole life but was not affiliated with any gangs. On May 26, 2018, Morgan and his family were getting kicked out of their apartment and were getting ready to move. Morgan left to buy some cocaine. He carried a backpack with him containing clothes that he intended to sell to help pay for a room for his mother. He testified that the backpack that other witnesses had described was the backpack he carried that day. Morgan was also carrying $40.46.

Morgan met up with Harrison, whom he had known since he was young and who was like family to him. The two met at a hamburger stand and Morgan told Harrison that he was going to buy some drugs. The first place they went did not have drugs, so Morgan decided to go to Kyle's apartment, which he had heard about in the neighborhood. Although he had heard of Kyle, Morgan had never met him before that day.

When they arrived at the apartment, Harrison went in first. Kyle was sitting on the couch when they entered and, when he saw Morgan, said, "Hold on," and "Wait, I don't know him." His tone was aggressive, which made Morgan feel scared and nervous. Harrison vouched for Morgan and Kyle replied, "Okay."

13

He then took out a pistol and set it on the ottoman, then pointed at a chair and told Morgan to take a seat. He asked what Morgan was trying to get. Morgan asked for cocaine and Kyle went towards the back of the apartment.

Morgan then heard rumbling and yelling. Harrison went back to see what was going on and Morgan heard him say, "Oh, shit." Morgan observed Harrison fighting with another man and saw Kyle fighting as well. The fight moved from the hallway into the living room. Morgan observed blood but did not see who was bleeding. During the fight, he remained in the chair in the living room, frightened. When the fight moved towards where he was sitting, Morgan grabbed the gun from the ottoman, exited the apartment, and moved to the walkway between the front door of the apartment and the gate to the complex. The apartment door then swung open and Kyle emerged. He looked "aggressive," "angry" and "pissed off," and approached Morgan. Morgan closed his eyes and shot at Kyle. When he saw Kyle lying on the ground, he ran to the back of the apartment complex, jumped the gate, and ran away. Morgan testified that he did not intend to kill Kyle, but was "just trying to protect [himself]" because he "didn't know what [Kyle] was going to do to [him]."

Morgan testified that he also saw a dark-skinned man in the hallway of the apartment and the man was not Tart.

On cross-examination, Morgan agreed that he had told arresting officers that he had blood on his shirt because he was leaning over Kyle to try and help him, before later admitting that he shot Kyle. Morgan further agreed that he had told detectives that Kyle had pulled out a bag of drugs and gave it to him and Harrison but stated at trial that he had lied about this. Morgan acknowledged that his testimony at trial was the first time he

claimed that another person was engaged in the altercation with Kyle. He agreed that he had informed detectives that the only people who were rumbling in the apartment were Kyle and Harrison but testified that he had lied.

**4.     Prosecution Rebuttal Evidence**

Detective Flaherty and his partner conducted recorded interviews of Morgan and Harrison. Neither Morgan nor Harrison mentioned a hamburger stand in their interviews. Morgan stated that they left from his mother's house. Further, neither Morgan nor Harrison mentioned the fifth, unknown man in their interviews with the detectives. Morgan told the detectives that he observed Kyle rumbling with Harrison and that he observed someone at the northwest bedroom window, the room in which Tart had been hiding. During the interview with detectives, Morgan stated that he had never been to the apartment, but then admitted that he had been there before only a few days prior.

## CONTENTIONS

Morgan and Harrison contend that the evidence was insufficient to support the finding that the murder of Kyle was premeditated and deliberate because there was no substantial evidence of prior planning or discussions about killing Kyle, or that the killing was committed in the perpetration of, or an attempt to perpetrate, robbery, as the prosecutor argued.

Separately, Morgan and Harrison raise several claims of prosecutorial misconduct.[4] Among other things, they argue that the prosecutor improperly shifted the burden of proof, elicited improper opinion testimony, erroneously referenced defendants' post-arrest silence, argued facts not in evidence, and misstated the law.

Morgan further contends that the court erred in failing to instruct the jury on the lesser included offense of voluntary manslaughter based on heat of passion and in failing to instruct the jury that provocation could negate premeditation and deliberation.

Morgan also argues that the sentences on the gun and ammunition charges in counts 2 and 3 violate section 654 because they were part of the same course of conduct as count 1, and that he is entitled to resentencing based on a change in the law with respect to section 654. He further argues that the court erred in imposing sentence for the firearm enhancement because it may have been unaware that it had discretion to strike the

_____

[4] In his briefs, Morgan makes a blanket statement that he joins in the claims raised by Harrison "that accrue to his benefit." Harrison made a similar statement in his opening brief, but withdrew his joinder on reply. The Attorney General argues that this attempt at joinder is improper. His argument is well taken. Our high court has expressed skepticism that "such cursory and unfocused statements are sufficient under the California Rules of Court, rules 8.630(a) and 8.200(a)(5), to permit joinder of appellate claims" in a multiple defendant appeal and "strongly disapprove[d] of this seriously improper tactic." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 363–364.) However, we need not consider whether Morgan's joinder was sufficient. As we discuss, we conclude that Harrison was not prejudiced by any prosecutorial misconduct. Thus, even if we presumed that Morgan is identically situated, Harrison's claims do not accrue to his benefit.

enhancement. Finally, Morgan contends that he is entitled to one additional day of presentence custody credit.

We conclude that the evidence was sufficient to support that the killing of Kyle by Morgan and Harrison was willful, deliberate, and premeditated. We hold that any prosecutorial errors, together or singly, were not prejudicial and do not require the reversal of Morgan's or Harrison's murder conviction. Further, we hold that the court did not err in failing to instruct the jury that provocation can negate premeditation and deliberation. To the extent that the court erred in failing to instruct the jury on voluntary manslaughter based on heat of passion, the error was harmless considering the jury's determination that the murder was premeditated and deliberate.

We further conclude there was sufficient evidence to support that Morgan purposefully took possession of the gun before the murder took place and that counts 2 and 3 were therefore not part of the same course of conduct as count 1 under section 654. However, we accept the Attorney General's concession that counts 2 and 3 were part of the same course of conduct and will therefore modify the judgment to stay the sentence for count 3. We reject Morgan's contention that the court erred in imposing a sentence for the firearm enhancement. Finally, we accept the Attorney General's concession that Morgan is entitled to one additional day of presentence custody credit and modify the judgment accordingly.

## DISCUSSION

## 1. Substantial evidence supports that Morgan's and Harrison's killing of Kyle was premeditated and deliberate.

### 1.1. Standard of Review

In assessing the sufficiency of the evidence to support a conviction, "we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357; see also *Jackson v. Virginia* (1979) 443 U.S. 307; *People v. Snow* (2003) 30 Cal.4th 43, 66.)

18

### 1.2. Analysis

Morgan and Harrison contend that the evidence was insufficient to support that they carefully weighed or considered killing Kyle, and that the murder of Kyle was therefore neither premeditated nor deliberate. We conclude that the evidence was sufficient to support the jury's findings.

Murder is of the first degree when it is willful, deliberate and premeditated. (§ 189, subd. (a).) Premeditation and deliberation require more than a showing of intent to kill. (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1069.) A killing is premeditated and deliberate if it is considered beforehand and occurred as the result of preexisting thought and reflection, rather than as the product of an unconsidered or rash impulse. (*People v. Pearson* (2013) 56 Cal.4th 393, 443.) "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance. (*Ibid.*) However, it is unnecessary to prove the defendant maturely and meaningfully reflected upon the gravity of his act. (§ 189, subd. (d).) Premeditation and deliberation do not require any extended period of time. (*People v. Salazar* (2016) 63 Cal.4th 214, 245.) The issue is not so much the duration of time as it is the extent of reflection, because thoughts may follow each other with great rapidity, and cold, calculated judgment may be arrived at quickly. (*People v. Potts* (2019) 6 Cal.5th 1012, 1027.)

"In *People v. Anderson* [(1968) 70 Cal.2d 15, 26] (*Anderson*), [the Supreme Court] identified 'three basic categories' of evidence [it] has generally found sufficient to sustain a finding of premeditation and deliberation: (1) planning activity, or 'facts about how and what defendant did prior to the actual killing which show that the defendant was engaged in activity directed

19

toward, and explicable as intended to result in, the killing'; (2) motive, or 'facts about the defendant's prior relationship and/or conduct with the victim from which the jury could reasonably infer a "motive" to kill the victim'; and (3) manner of killing, or 'facts about the nature of the killing from which the jury could infer that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a "preconceived design" to take his victim's life in a particular way for a "reason" . . . .' [Citation.]" (*People v. Morales* (2020) 10 Cal.5th 76, 88–89 (*Morales*).) "In the years since *Anderson*, ' "[the Supreme Court] ha[s] emphasized that its guidelines are descriptive and neither normative nor exhaustive, and that reviewing courts need not accord them any particular weight." ' [Citation.]" (*Id.* at p. 89.) Further, "the Supreme Court has described the various *Anderson* categories in the disjunctive, inserting an 'or' in the series . . . ." (*People v. Nazeri* (2010) 187 Cal.App.4th 1101, 1113.)

Review of the sufficiency of the evidence to support a premeditation finding involves consideration of the evidence presented and all logical inferences in light of the above definitions of premeditation. (*People v. Perez* (1992) 2 Cal.4th 1117, 1124.) We conclude that substantial evidence supports the jury's conclusion that Harrison and Morgan committed premeditated and deliberate murder.

Beginning with the factor with the strongest evidentiary support, the jury could have inferred premeditation and deliberation from the manner of killing. The evidence supports that Harrison inflicted 16 sharp force wounds, four of which were independently fatal. A jury could infer from the location of the fatal wounds—the lower left chest, upper right back, and lower

20

middle back—that Harrison was targeting vital areas of Kyle's body with the purpose of killing him. (See *People v. Moore* (2002) 96 Cal.App.4th 1105, 1114 [evidence that "defendant stabbed the victim not in the arm or leg, but in the abdomen, an extremely vulnerable area of the body" supported finding of premeditation and deliberation].) The Supreme Court has recognized on numerous occasions that the infliction of multiple stab wounds to a victim tends to support a finding of premeditation. (See *Morales*, *supra*, 10 Cal.5th at p. 102 [evidence that adult victims suffered multiple fatal stab wounds was among the facts that "bore most directly on whether [the defendant] acted with premeditation and deliberation"]; *People v. Elliot* (2005) 37 Cal.4th 453, 471 [three potentially lethal knife wounds, together with numerous other stab and slash wounds, implied a preconceived design to kill]; *People v. San Nicolas* (2004) 34 Cal.4th 614, 658–659 [sheer number of stab wounds on victim supported a finding of deliberation]; *People v. Pride* (1992) 3 Cal.4th 195, 247 ["A violent and bloody death sustained as a result of multiple stab wounds can be consistent with a finding of premeditation."]; *People v. Alcala* (1984) 36 Cal.3d 604, 627 [evidence of multiple stab wounds and blunt force trauma to the victim's head "support[ed] the inference of a calculated design to ensure death, rather than an unconsidered 'explosion' of violence"].) The Supreme Court has also recognized that, even if multiple wounds may suggest rage, that does not preclude an inference of premeditation. (*People v. Thomas* (1992) 2 Cal.4th 489, 518.)

The evidence further indicates that Morgan encountered the victim after he had sustained 16 sharp force wounds and was bleeding profusely. Lozoya testified that Kyle was staggering

when he exited the apartment, suggesting that he was weak from the loss of blood caused by his severe injuries. Further, she testified that the man with the gun followed Kyle towards the street and shot him from behind. This is consistent with the forensic examiner's testimony, which suggested that the fatal gunshot wound was inflicted to Kyle's back when he was already on the ground. The infliction of multiple gunshot wounds on an unarmed and retreating individual is consistent with premeditation and deliberation. (See *People v. Silva* (2001) 25 Cal.4th 345, 369 ["The manner of killing—multiple shotgun wounds inflicted on an unarmed and defenseless victim who posed no threat to defendant—is entirely consistent with a premeditated and deliberate murder."]; *People v. Brito* (1991) 232 Cal.App.3d 316, 323 [upholding a finding of premeditation and deliberation where the defendant shot a retreating victim in the back]; see also *People v. Koontz* (2002) 27 Cal.4th 1041, 1082 ["firing a shot at a vital area of the body at close range" is "indicative of a deliberate intent to kill"].)

With respect to planning activity, the jury could have reasonably inferred from the evidence that Harrison and Morgan came to the victim's apartment armed with a knife and gun, respectively, which supports a finding of premeditation and deliberation. (See *People v. Lee* (2011) 51 Cal.4th 620, 636 [that defendant brought a firearm showed he considered the possibility of a violent encounter]; *People v. Steele* (2002) 27 Cal.4th 1230, 1250 ["jury could infer that defendant carried the fatal knife into the victim's home in his pocket, which makes it 'reasonable to infer that he considered the possibility of homicide from the outset' "].) Although both defendants testified that they encountered these weapons at Kyle's apartment, a rational trier

22

of fact could discredit these claims as improbable and self-serving. Their claim that a fifth man was present was not supported by the testimony of Tart or Lozoya or by any conclusive DNA evidence, and the man was never identified. The jury could reasonably doubt that Harrison disarmed a man 60 to 80 pounds heavier and over half a foot taller and pocketed that man's knife. Similarly, a rational trier of fact could doubt Morgan's claim that Kyle, who appeared uneasy about his presence, left a gun sitting out for Morgan to take, rather than keeping it on his person. Further, Tart testified that he heard Harrison tell Morgan, "Shoot this motherfucker. Don't let him out." The jury could infer that Harrison told Morgan to shoot because he knew that Morgan was armed with a gun.

With respect to motive, Harrison apparently intended to buy weed, but had only $1 in his wallet. Morgan testified that he intended to buy cocaine and that Kyle's apartment was a place that was known in the neighborhood to have drugs. Morgan had $40, but his family had lost their home that day and he intended to sell clothes for money to help pay for another place. Although officers did not recover any drugs from the defendants or from the apartment, Morgan told detectives that Kyle had pulled out a bag of drugs and handed it to them. As discussed above, a rational trier of fact could conclude that Harrison and Morgan were armed when they arrived at Kyle's apartment. Thus, taken all together, the evidence permits the inference that Morgan and Harrison went to Kyle's apartment with the purpose of taking drugs by force and that there was cocaine there for the taking, whatever may have happened to it in the chaos that followed.

23

In sum, we cannot conclude that no rational trier of fact could have found premeditation and deliberation beyond a reasonable doubt based on the evidence presented.

Harrison argues that *People v. Boatman* (2013) 221 Cal.App.4th 1253 (*Boatman*) supports that the evidence is insufficient to support the first degree murder conviction. In *Boatman,* the defendant shot the victim, his girlfriend, once in the face while they were together in his bedroom. (*Id.* at p. 1258.) The defendant gave conflicting accounts of what happened but was holding the victim in his arms when the police arrived and was heard weeping in the background during the 911 call reporting the incident. (*Id.* at pp. 1258–1261.) The court concluded that insufficient evidence supported the conclusion that the defendant's killing of his girlfriend was premeditated, citing the *Anderson* factors. First, the case lacked any evidence of planning. "The house was occupied by four other people who could identify him. There is no evidence that defendant left the room or the house to get a gun, or that he even moved from his squatting position on the floor. Indeed, the only evidence regarding his possession of the gun was that he took it away from Marth just prior to the shooting." (*Id.* at p. 1267.)

The court also concluded that there was "little or no relevant motive evidence." (*Boatman*, *supra*, 221 Cal.App.4th at pp. 1267–1268.) The court observed that shooting the victim in the face supports a finding of malice, it does not necessarily support that the gunshot "was pursuant to a ' "preconceived design" to take his victim's life . . . .' " (*Id.* at p. 1268.) The court observed that, "[e]ven when manner of killing evidence is strong, cases in which findings of premeditation and deliberation are upheld typically involve planning and motive evidence as well."

24

(*Ibid*.) "Cases that have found sufficient evidence of premeditation and deliberation in the absence of planning or motive evidence are those in which '[t]he manner of the killing clearly suggests an execution-style murder.' " (*Id*. at p. 1269.) The court in *Boatman* rejected the prosecution's contention that premeditation and deliberation were established because the evidence supported an inference that the defendant " 'took the time to pull back the hammer, point the pistol at [the victim's] face, and fire the weapon.' " (*Id*. at p. 1273.)

While the single gunshot to the face in *Boatman* was insufficient to establish deliberation and premeditation under the facts there (*Boatman*, *supra*, 221 Cal.App.4th at pp. 1268–1269), the circumstances here support a contrary result. As discussed, the evidence here permits the inference that Harrison stabbed the victim sixteen times, including in the abdomen and back, and Morgan fired at the victim's back as he attempted to escape. Moreover, unlike in *Boatman*, a rational trier of fact could conclude that the defendants had prepared for the possibility of violence and came to the apartment where Kyle was staying armed with weapons. In *Boatman*, the gun was already present in the room where the defendant and his girlfriend were. (*Id*. at p. 1267.)

Morgan argues that *People v. Wear* (2020) 44 Cal.App.5th 1007 (*Wear*) supports the conclusion that his actions were not premeditated or deliberate. In *Wear*, the defendant took a friend to meet the victim, "apparently intend[ing] to buy or steal a gun from [the victim] and possibly to supply him with heroin. The evidence suggested that an argument arose during the meeting, and [the victim], who had two guns with him, shot [the friend] once with one of them. [The defendant], who was unarmed, then

seized that gun, shot [the victim] twice with it, and fled with the other gun." (*Id.* at pp. 1009–1010.) The defendant was convicted of first degree murder. (*Id.* at p. 1010.) The *Wear* court held there was insufficient evidence of premeditation and deliberation. (*Id.* at p. 1023.) Circumstances supporting a finding that the defendant "planned to obtain a gun from [the victim], do not, in and of themselves, support a reasonable inference that [the defendant] planned to *kill* [the victim]." (*Id.* at p. 1025.) The defendant "had threatened to kill [the victim] months before the shootings," but the threat was both remote in time and "evinced no particular plan to follow through." (*Id.* at pp. 1028–1029.) There was "some evidence of motive," specifically, the defendant and the victim "knew each other and had some sort of falling out that may have been unresolved at the time of the shootings." (*Id.* at p. 1029.) The fact that the defendant shot the victim "twice in the face from close range, at least once after [the victim] was already lying on the ground" was evidence that the defendant "intentionally killed [the victim]" but not evidence of premeditation. (*Id.* at pp. 1029–1031.) Evidence that, after the shooting, the defendant fled with the victim's possessions and attempted to avoid arrest "may tend to show guilt" but did not "support the conclusion that [the defendant] committed premeditated and deliberate murder as opposed to second degree murder or any lesser homicide offense." (*Id.* at p. 1031.) "In sum, the lack of evidence of planning, weak evidence of motive, and absence of any other evidence suggesting premeditation and deliberation, combined with the strong evidence that [the defendant] impulsively shot [the victim] after [the victim] shot [the friend], leads us to conclude that insufficient evidence supports a verdict of premeditated murder." (*Id.* at p. 1032.)

Unlike in *Wear*, the evidence here does not suggest that Kyle instigated the altercation that led to his death. Even by Harrison's account, it was the unidentified man who was armed with the knife and started stabbing Kyle. A rational trier of fact could reject the defendants' claim that a fifth person was present in the apartment and conclude that it was Harrison who attacked Kyle with the knife without provocation. Similarly, a reasonable jury could conclude from the evidence presented that Kyle did not approach Morgan in a threatening manner, but that Kyle was attempting to get away when Morgan pursued him and shot him multiple times. Further, as discussed above, the evidence permits the inference that the defendants were armed when they arrived at the apartment, unlike the defendant in *Wear*.

As the court in *Wear* cautioned, " 'When we decide issues of sufficiency of evidence, comparison with other cases is of limited utility, since each case necessarily depends on its own facts.' [Citation.]" (*Wear*, *supra*, 44 Cal.App.5th at p. 1030.) Given the many factual differences between this case and *Boatman* and *Wear*, we hold that neither case compels the conclusion that insufficient evidence supported the jury's finding of premeditation and deliberation as to both Morgan and Harrison.

## 2. Morgan's Claims of Prosecutorial Misconduct

"[A] prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom." (*People v. Hill* (1998) 17 Cal.4th 800, 819.) "Under California law, a prosecutor commits reversible misconduct if he or she makes use of 'deceptive or reprehensible methods' when attempting to persuade either the trial court or the jury, and it is reasonably probable that without

27

such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.]" Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights—such as a comment upon the defendant's invocation of the right to remain silent—but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action ' "so infected the trial with unfairness as to make the resulting conviction a denial of due process." ' [Citations.]" (*People v. Riggs* (2008) 44 Cal.4th 248, 298.)

"It is well settled that making a timely and specific objection at trial, and requesting the jury be admonished (if jury is not waived), is a necessary prerequisite to preserve a claim of prosecutorial misconduct for appeal. [Citations.] 'The primary purpose of the requirement that a defendant object at trial to argument constituting prosecutorial misconduct is to give the trial court an opportunity, through admonition of the jury, to correct any error and mitigate any prejudice.' [Citation.]" (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328.)

Morgan acknowledges that his counsel failed to object to the prosecutor's comments shifting the burden of proof and criticizing appellant's failure to remember details about the fifth person in the apartment. He argues that appellate courts are not prohibited from reaching questions that were not preserved for review and, in the alternative, he received ineffective assistance of counsel. We exercise our discretion to address these claims on the merits to eliminate the need to address his alternative ineffective assistance of counsel claim. (See *In re Victor L.* (2010) 182 Cal.App.4th 902, 928.)

## 2.1. Reference to Defendants' Ability to Have Materials Tested

Morgan contends that the prosecutor's argument that defendants could have requested access to evidence to perform their own DNA testing improperly shifted the burden of proof to defendants. We conclude that the prosecutor's argument constituted a fair comment on the evidence. Further, any error was harmless considering the court's instruction that the People bear the burden of proof and the prosecutor's repeated acknowledgment that she had the burden.

### 2.1.1. Additional Background

During his cross-examination of criminalist Robert Broderick, counsel for Morgan asked Broderick whether, in addition to the samples he tested, he was aware of 29 additional samples that were taken from the inside of the apartment and two additional samples that were taken from the outside. Broderick stated that he was not aware of the additional swabs and that he had not been asked to test any samples beyond the 12 that he tested.

On redirect, the prosecutor asked Broderick whether the defense has the ability to test samples from the case, including those taken from the exterior of the apartment that Broderick did not test. Broderick stated that the defense team can request that evidence be released for testing and that he has made evidence available to defense teams in the past.

During his questioning of Detective Flaherty, counsel for Morgan once again raised the 29 blood samples collected from the interior of the apartment and the two blood samples collected from the exterior of the apartment. Detective Flaherty stated

that he did not request that those specific samples be tested. He explained that he knew from other evidence that only four people were present at the time of the murder and that, since the apartment was used by many people and multiple people came and went, it was likely that the samples could reflect DNA from anybody.

The court instructed the jury: "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt."

In her opening argument, the prosecutor stated: "My opening argument is going to be a little bit lengthy because I have the job, I have the burden. So—I also have the job of proving to you not only the facts but explaining the law." Later in her opening argument, the prosecutor reiterated that "[t]he People have the burden to prove this case to you beyond a reasonable doubt. There is no question about that. It's my burden, and I have to prove it to you beyond a reasonable doubt."

Counsel for Harrison argued during his closing that the fact that one or two of the DNA samples came back inconclusive "lends support to the idea that there was a fifth person there." During her rebuttal argument, the prosecutor explained, "I have the burden; so I have the last argument." She argued that there was no evidence to support that a fifth person was present in the apartment and explained that "only two items of DNA evidence . . . came back inconclusive." The first item was the gun grip and the second item was the right shoe worn by defendant Morgan, for which the DNA evidence said that there were at least three male contributors who could not be identified. The

prosecutor argued: "How does that suddenly equal there's a fifth person inside the house? If there was truly a fifth person inside of the house, ladies and gentlemen, and defendant Harrison had said that to you, why didn't they have any of the 29 swabs in the house tested? Why didn't they? You hear the DNA lab tell you that they keep it for people if they want more testing, if they want re-testing, if defense wants to request testing. If they had information there was a fifth person inside of the house, why didn't they have the 29 swabs tested?" Defense counsel did not object to this argument.

### 2.1.2. Analysis

A prosecutor may comment " 'on the state of the evidence, or on the failure of the defense to introduce material evidence or to call logical witnesses.' [Citation.]" (*People v. Turner* (2004) 34 Cal.4th 406, 419.) "A distinction clearly exists between the permissible comment that a defendant has not produced any evidence, and on the other hand an improper statement that a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1340 [prosecutor's comments did not impermissibly shift the burden where prosecutor stated at the outset the prosecution had the burden of proof].)

In *People v. Cook* (2006) 39 Cal.4th 566, the prosecution's expert witness testified that the bullets that killed two of the murder victims came from the same gun. The defense theory was that two different guns had been used. In closing, the prosecutor addressed the defense theory, asking where the second gun was and stating that the defense could have called experts, but did not. (*Id.* at p. 607.) After the defense objected that the prosecutor was burden shifting, the trial court reminded the jury that the

31

prosecutor had the burden of proof. The prosecutor acknowledged this burden, but again argued the defendant had a right to produce an expert who could have testified whether the bullets were consistent with two different guns having been used to kill the two victims. (*Id.* at p. 608.) After noting that "[a] prosecutor may make fair comment on the state of the evidence," the court concluded the prosecutor's statements were fair comment on the absence of evidence of a second gun. Moreover, the trial court had properly admonished the jury that the People bore the burden of proof. (*Ibid.*)

We conclude that the circumstances here are comparable to those present in *People v. Cook*, *supra*, 39 Cal.4th 566, and that the prosecutor did not commit error. Counsel for Morgan questioned multiple witnesses about the untested samples, and counsel for Harrison argued that the fact that certain DNA analyses were inconclusive supported that a fifth person was present. As Morgan acknowledges, the defense's theory "was that Tart was wrong and a fifth person was in that apartment." The prosecutor could fairly comment on the absence of any material evidence supporting this theory. Morgan concedes that the prosecutor did not state that defense counsel was obligated to perform additional testing but argues that her statements suggested that the defendants had the burden to prove innocence. We disagree. The prosecutor did not argue defendants were required to present any evidence and repeatedly stated that she bore the burden of proof.

Although Morgan contends that the circumstances of *People v. Frye* (1998) 18 Cal.4th 894 are distinguishable from those present here, we believe that *Frye* supports the conclusion that the prosecutor did not commit error. In *Frye*, the prosecutor

pointed out in closing argument that the jury had been told that they would hear from a neuropsychologist who did not end up testifying for the defense. (*Id.* at p. 973.) The prosecutor argued, " '[Y]ou may reasonably infer, if that psychologist had some real helpful information to the defense, you would have heard from her.' " (*Ibid.*) Our Supreme Court "conclude[d] that the prosecutor's reference to the defense team's failure to call [the neuropsychologist] was proper. Here, the prosecutor's remark was a comment on a weakness in defendant's theory of the case, in no way suggesting defendant had the burden of proving his innocence. To the contrary. She told jurors the People had the burden of proof on each and every count. Moreover, the trial court instructed the jury defendant was presumed innocent until his guilt was proven, and that this presumption placed on the prosecution the burden of proving him guilty beyond a reasonable doubt." (*Ibid.*) These same mitigating factors are present here.

Even if we concluded that the prosecutor's argument was improper, we would find no prejudice considering the court's instructions and the prosecutor's acknowledgment that she had the burden. Thus, there is no " ' "reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." [Citation.]' " (*People v. Carter* (2005) 36 Cal.4th 1215, 1263.)

### 2.2. Eliciting Improper Opinion Testimony

Morgan argues that the prosecutor improperly sought opinion testimony from Detective Flaherty concerning Lozoya's demeanor. We conclude that this claim was forfeited. Even if we reached this contention, we would conclude that any error was harmless because the court sustained defense counsel's objections and ordered the jury to disregard the questions.

33

### 2.2.1. Additional Background

During her redirect examination of Detective Flaherty, the prosecutor asked several questions about Lozoya's statements to Detective Flaherty in her prior interview and played portions of that interview for the jury. The prosecutor then inquired whether Detective Flaherty had observed her demeanor when she testified at trial, and whether he was present when she approached Morgan's mother. He answered both questions in the affirmative. The prosecutor asked whether Lozoya "wanted [Morgan's mother] to know that she wasn't in any way implicating anyone in this case." Counsel for Morgan objected and the court sustained the objection. The prosecutor then asked, "Based on her demeanor and how you saw her testify—and I'm assuming the hundreds of trials that you've been part of involving gang-related incidents— is that uncommon, her behavior to you?" Counsel for Morgan objected and the court sustained the objection. The prosecutor asked, "Well, was it surprising to you that she was—" Counsel for Morgan again objected, and the court sustained the objection. The prosecutor asked no further questions.

The court instructed the jury, "You must decide what the facts are. It is up to all of you and you alone to decide what happened based only on the evidence that has been presented to you in this trial." It further instructed, "During the trial the attorneys may have objected to questions or moved to strike answers given by the witnesses. I ruled on the objections according to the law. If I sustain an objection, you must ignore the question. If the witness was not permitted to answer, do not guess what the answer might have been or why I ruled as I did."

### 2.2.2. Analysis

As discussed above, a defendant may not complain on appeal of prosecutorial misconduct unless the defendant made a timely objection *and* requested that the jury be admonished to disregard the impropriety. (*People v. Seumanu*, *supra*, 61 Cal.4th at p. 1328.) This requirement is excused only if an objection would have been futile or an admonition would not have cured the harm. (*People v. Dykes* (2009) 46 Cal.4th 731, 760.)

Morgan's trial counsel objected to the prosecutor's questions to Detective Flaherty regarding Lozoya, but he did not request that the court admonish the jury. Morgan fails to argue on appeal that an admonition would have been futile. Thus, the claim of prosecutorial misconduct was not preserved.

Even if we reached this issue, we would not find the prosecutor's questions to be prejudicial. The court sustained trial counsel's objections before Detective Flaherty even responded to the questions that Morgan contends solicited inappropriate opinion testimony. Considering the court's instructions and admonition, it is unclear how the questions could have improperly influenced the jury or prejudiced Morgan when Detective Flaherty did not even respond. (See *People v. Greeley* (2021) 70 Cal.App.5th 609, 620 [even assuming misconduct, prosecutor's question was harmless where "defense counsel's objection was sustained before the prosecutor even finished the question or [the witness] responded].)

### 2.3.   References to Defendants' Post-Arrest Silence

Morgan contends that certain lines of questioning and argument by the prosecutor were error under *Doyle v. Ohio* (1976) 426 U.S. 610 (*Doyle*), which held that a defendant's

postarrest silence after *Miranda* warnings are given may not be used to impeach the defendant's trial testimony, or at trial to imply guilt from that silence. (See *People v. Hollinquest* (2010) 190 Cal.App.4th 1534, 1555.) We conclude that the sole comment concerning Morgan was not improper under *Doyle*. Even assuming that the prosecutor committed error by commenting on Harrison's silence, we perceive no prejudice to Morgan.

### 2.3.1. Additional Background

During her cross-examination of defendant Harrison, the prosecutor asked Harrison why he had not mentioned the six-foot tall, 200-pound man who was purportedly also in the apartment to Detective Flaherty while making his statement. After receiving no direct response to the question, the prosecutor asked again: "Everything you've testified today in court in front of this jury you never told Detective Flaherty in your interview. Isn't that true? Yes or no." Harrison agreed that it was true and stated that he "[n]ever told [Detective Flaherty] nothing" and "never will tell him nothing." The prosecutor asked whether it was true that Harrison had never told anyone what he testified to in court that day. Harrison replied that he "never talked to the detective about nothing that happened in that apartment."

The prosecutor then asked Harrison whether he had been in court on at least 20 occasions over the last year and a half, including the preliminary hearing, during which the prosecution put on evidence. Harrison agreed. The prosecutor then asked: "And you have never, ever told this story in court ever before this date. Isn't that true?" Defense counsel objected and the court sustained the objection and instructed the jury to ignore the question and the answer.

36

Outside the presence of the jury, the judge stated: "I'm just going to put all counsel on notice there should not be any reference to the fact that Mr. Harrison did not say anything or talk or mention or give any information regarding him testifying because he has the right to remain silent. So, now, if he can be impeached with a prior statement, that's different. But he has—has the right to remain silent up until this point. So that's why I sustained that objection. That's why I admonished the jury to ignore not only the question but to disregard the question and response. [¶] So are we—everyone on the same footing as to that matter I'm assuming?"

The prosecutor argued that Harrison had waived that right by testifying, but the court disagreed and stated, "You can cross examine him, but you can't question him about the fact that he previously exercised his right to remain silent . . . ." The court further warned the prosecutor that "if you choose to go there in closing argument, you're committing reversible error."

During her closing argument, the prosecutor argued that there was no evidence of a fifth person in the apartment "[o]ther than [Harrison's] statement, other than his testimony." She further stated, "And it's funny how he never mentioned during his interview to Detective Flaherty that there was this fifth person stabbing a victim who was six feet tall, 220 pounds with braids. He kept that. He kept that in his heart, ladies and gentlemen, and made sure he was only going to say it a year and a half later when he was sitting in trial [in] front of you guys because that makes sense. I'm going to sit here a year and a half pending a murder investigation, a murder charge, but I'm not going to tell anybody who did it, and I'm only going to bring out this man with the braids in court." Counsel for Harrison and

37

Morgan objected and the court held a side bar. Counsel for Morgan argued that the prosecutor was "hinting and going at the fact that he did not make any statements prior to that which he doesn't have to. It's his Fifth Amendment right." The court echoed this concern and advised the prosecutor: "You know, whether he may have said it was somebody else, that's fine. You can argue that. But stay away from any hint that because someone exercised their right to remain silent that the jurors can consider that."

The prosecutor argued that once a defendant takes the stand, he waives his Fifth Amendment right. The court replied, "I indicated previously my position on this. If you want to continue to go that route, you can. It's up to you. But I think that what you said out there in terms of what he said to the detective, that's fine. You can argue that he didn't mention it to the detective. But you can't imply to the jurors find him guilty or find that he was guilty or that there's evidence of his guilt because they exercised their right to remain silent. It's akin to *Doyle* error."

The prosecutor argued again that Harrison had waived his right to remain silent by waiving his *Miranda* rights and giving a statement to detectives. The court replied, "So you can talk about that statement. I agree with you there, But I'm suggesting and I said earlier why you would want to create an issue, I don't know in that area when it's not necessary. And as I've indicated, I directed you—I would suggest you stay away from there . . . . But the inference that I don't want the jury to think about is they consider the fact that he may have chosen to remain silent at that time because he had the right at that time." Counsel for Morgan asked that the court find that the prosecutor had engaged in misconduct, that it was error, and asked that the

court admonish the jury about Harrison's Fifth Amendment rights. Counsel for Harrison joined in the request. After further argument from the prosecutor, the court denied the request for mistrial but warned the prosecutor, "[I]f you go there again, I'm sure we'll have another side bar. It's up to you." The prosecutor stated that she was done pursuing that line of argument and stated, "I made it clear that I was taking about [Harrison] never said it to the detective." The court agreed that "[t]hat part is fine." The court further stated that it would not admonish the jury, explaining, "I'd rather not have the jury think about that issue and have them discuss it . . . It was a quick reference. It was slight. You objected. We dealt with it at side bar. I think we're okay."

Later in her argument, the prosecutor stated, "It's funny also that defendant Morgan never told the detectives about this unknown assailant. He told you in the trial, but we know from his interview he told the detectives that two people were fighting with Tap and Gerod. Those were his exact words. And that was the part of the interview that you heard yesterday. [¶] So why would he lie to the detective when he's actually trying to get himself out of trouble during the interview and say it was Tap and Gerod but then come to court and say no, it actually wasn't Gerod. It was somebody else? That doesn't make any sense." Defense counsel did not object to these statements.

Following the conclusion of the prosecutor's closing argument, the court stated that it wanted to "put a couple things on the record" with regards to the side bar conversation. The court explained, "The prosecutor may point out the inconsistencies between the defendant's statement to the police and his jury trial testimony which is exactly what I've said you're

39

free to do, but it is *Doyle* error to do so by showing that the defendant did not talk to police again after giving a statement and before trial."

### 2.3.2. Analysis

"In *Doyle*, the United States Supreme Court held that it was a violation of due process and fundamental fairness to use a defendant's postarrest silence following *Miranda* warnings to impeach the defendant's trial testimony. [Citation.] However, *Doyle* does not apply when a defendant presents exculpatory testimony at trial inconsistent with a voluntary post-*Miranda* statement. [Citation.]" (*People v. Collins* (2010) 49 Cal.4th 175, 203 (*Collins*).)

The United States Supreme Court addressed *Doyle* error in *Anderson v. Charles* (1980) 447 U.S. 404 (*Anderson v. Charles*). In *Anderson v. Charles*, the defendant waived his *Miranda* rights and said that he had stolen the murder victim's car from a particular location. (*Id.* at p. 405.) At trial, he testified that he stole the car from a different location. (*Ibid.*) The prosecutor questioned the defendant about his opportunity to change the facts and then asked: " 'Don't you think it's rather odd that if it were the truth[,] that you didn't come forward and tell anybody at the time you were arrested, where you got the car?' " (*Id.* at pp. 405–406.) In a per curiam opinion, the court held that "*Doyle* bars the use against a criminal defendant of silence maintained after receipt of governmental assurances. But *Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain

40

silent. As to the subject matter of his statements, the defendant has not remained silent at all. [Citations.]" (*Id.* at p. 408.)

In *Collins*, the defendant argued that the prosecutor had violated *Doyle* by questioning the defendant about his failure to reveal an alibi to a detective or during his prior court appearances, and by commenting on his failure to raise his alibi in her closing argument. (*Collins, supra,* 49 Cal.4th at pp. 199–202.) Our high court concluded that no *Doyle* error had occurred. (*Id.* at p. 203.) The court observed that, as in *Anderson v. Charles*, the "[d]efendant was not 'silent' on his whereabouts at the time of the murder; he chose to provide varied explanations that differed from his trial testimony. The Supreme Court stated in *Anderson* that each of the 'inconsistent descriptions of events may be said to involve "silence" insofar as it omits facts included in the other version. But *Doyle* does not require any such formalistic understanding of "silence," and we find no reason to adopt such a view in this case.' [Citation.]" (*Id.* at p. 204.) The *Collins* court further explained that the defendant's complaint "that the prosecutor did not question him about inconsistencies in his statements, but instead focused on his failure to reveal his alibi" had similarly been addressed in *Anderson v. Charles*. (*Ibid.*) The Supreme Court rejected the federal appeals court's conclusion "that the exchange regarding the defendant's ' "failure to tell arresting officers the same story he told the jury" ' was an unconstitutional inquiry about postarrest silence . . . explaining that the prosecutor's cross-examination could not be 'bifurcated so neatly' and must be considered as a whole" and concluding "that questions regarding the defendant's failure to tell the police the same story 'were not designed to draw meaning from silence,

41

but to elicit an explanation for a prior inconsistent statement.' [Citation.]" (*Ibid.*)

The California Supreme Court concluded that "the prosecutor properly questioned defendant about the different explanations he gave [the detective]" and her "questions regarding defendant's failure to come forward earlier with his alibi were asked in the context of those interview statements." (*Collins, supra*, 49 Cal.4th at p. 204.) Thus, "[t]he questions were a legitimate effort to elicit an explanation as to why, if the alibi were true, defendant did not provide it earlier. As such, neither the questions nor the prosecutor's remarks in closing argument were 'designed to draw meaning from silence.' [Citation.]" (*Ibid.*)

Much of the questioning and argument that Morgan cites pertained to Harrison, who does not raise this issue or join in Morgan's argument. With respect to the comment pertaining to Morgan, we perceive no error. The prosecutor pointed out that Morgan, who waived his *Miranda* rights and agreed to speak with detectives, told them that he had witnessed Kyle and Harrison fighting. At trial, he claimed that Kyle was fighting with a different man whom he had not mentioned to the detectives. As in *Anderson v. Charles*, Morgan was not silent about the subject matter of his later testimony, and thus *Doyle* does not apply to the prosecutor's argument addressing his prior inconsistent statements.

We next turn to whether the prosecutor's statements concerning Harrison were error and, if so, whether those errors prejudiced Morgan. With respect to the prosecutor's commentary on Harrison's failure to mention the unidentified fifth man during his various appearances in court, we will assume for the sake of argument that the prosecutor improperly commented on

Harrison's post-arrest silence. However, the court sustained the objection from defense counsel and admonished the jury to disregard the question and answer. "The United States Supreme Court has explained that a *Doyle* violation does not occur unless the prosecutor is *permitted* to use a defendant's postarrest silence against him at trial, and an objection and appropriate instruction to the jury ordinarily ensures that the defendant's silence will not be used for an impermissible purpose." (*People v. Clark* (2011) 52 Cal.4th 856, 959.) Morgan fails to argue that the court's instruction to the jury was inadequate. Thus, we conclude that there was no *Doyle* violation.

We also perceive no error in the prosecutor's statement concerning Harrison during her closing argument. "[T]he *Doyle* rule [does] not prohibit the prosecution's use of [the defendant's] selective silence as adoptive admissions" where the defendant "voluntarily spoke with a police detective after receiving *Miranda* warnings." (*People v. Bowman* (2011) 202 Cal.App.4th 353, 364.) The prosecutor commented on the fact that Harrison spoke with Detective Flaherty yet did not mention the presence of the fifth man. The record indicates that Harrison waived his *Miranda* rights, agreed to speak with defendants, and responded to certain of their questions, including whether the backpack belonged to Morgan. There is no basis in the record to conclude that Harrison's failure to inform detectives of the presence of the fifth man was because he invoked his right to remain silent. Thus, the brief portion of the prosecutor's argument addressing Harrison's postarrest silence was not an attempt to draw attention to that silence as substantive evidence of guilt, but to point out that Harrison willingly spoke with detectives yet failed to inform them of exculpatory information on which he later relied. The

43

circumstances here are thus comparable to *Collins*, where the defendant spoke with detectives but did not mention the alibi on which he later relied. Considered in context, it does not appear that the prosecutor's remarks during argument were meant to draw meaning from a post-*Miranda* or post-appointment-of-counsel invocation of silence by Harrison. The prosecutor's commentary on Harrison's silence concerning the fifth man was raised "in the context of [his prior] interview statements" and was not a *Doyle* violation. (*Collins*, *supra*, 49 Cal.4th at p. 204.)

Assuming for the sake of argument that the prosecutor did commit a *Doyle* violation with respect to her questioning or argument, we conclude any such error was harmless beyond a reasonable doubt and, therefore, does not require reversal. (See *People v. Quartermain* (1997) 16 Cal.4th 600, 621; *People v. Galloway* (1979) 100 Cal.App.3d 551, 559; *Chapman v. California* (1967) 386 U.S. 18.) To determine whether reversal is necessary based on a *Doyle* error, we must consider the extent of the comments made, how the statement would have been understood by a reasonable juror in context, whether the prosecutor suggested an inference of guilt based on the invocation, and the overall strength of the case. (*People v. Benson* (1990) 52 Cal.3d 754, 793; *People v. Hollinquest*, *supra*, 190 Cal.App.4th at p. 1559.) We will not assume that the jury drew the most damaging meaning possible from the disputed comments; instead, the defendant must establish a reasonable likelihood that the jury understood and applied the comments in an improper manner. (*People v. Frye*, *supra*, 18 Cal.4th at p. 970; *People v. Spector* (2011) 194 Cal.App.4th 1335, 1403.)

The evidence against Morgan was very strong. He admitted to shooting Kyle. There was also substantial evidence to support

that Morgan pursued Kyle, who had already sustained four fatal wounds, while he attempted to stagger away and shot him multiple times. Whether the fifth man was present or not had far more bearing on Harrison's case than Morgan's. Thus, it is unlikely that the jury would place much, if any, weight on the fact that Morgan did not mention the fifth man during his interview with detectives when determining whether he was guilty. To the extent that the prosecutor erroneously used Harrison's selective silence during questioning with detectives or during prior court appearances to undermine his credibility, it is unclear what impact this would have had on Morgan's case. Harrison testified that he did not notice Morgan after the fight began, and thus said nothing that corroborated Morgan's claim that he shot Kyle out of fear and to defend himself.

## 2.4. Prosecutor's Purported Misstatement of the Law Concerning Self-Defense

Morgan argues that the prosecutor misstated the law of imperfect self-defense by stating that the standard was subjective. We conclude that any error was harmless, as the jury was correctly instructed on the law and was instructed to follow the court's instructions over the argument of counsel.

### 2.4.1. Additional Background

The court instructed the jury: "You must follow the law as I explain it to you even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions."

With respect to justifiable homicide, the jury was instructed with CALCRIM No. 505. In relevant part, the instruction stated: "The defendant Dean Morgan is not guilty of

murder if he was justified in killing someone in self-defense. The defendant acted in self-defense if: [¶] 1. The defendant reasonably believed he was in imminent danger of being killed or suffering great bodily injury; [¶] 2. The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger; [¶] AND [¶] 3. The defendant used no more force than was reasonably necessary to defend against the danger. [¶] . . . Defendant's belief must have been reasonable and he must have acted only because of that belief. The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the killing was not justified. [¶] When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed."

During her closing argument, while discussing Morgan's claim of self-defense, the prosecutor stated that complete self-defense requires that the defendant was "confronted with the immediate threat of great bodily injury or death." She continued, "We have an individual who is bleeding to death having been stabbed 15 times walking towards you. Where is the imminent danger of great bodily injury to you? You're the one holding the gun. [¶] Still, if you want to believe that, an unarmed individual having been stabbed 15 times taking his last few breaths coming at you, you find that to be terrifying? If you even believe it happened that way, you have to shoot them four times? Is that reasonable use of deadly force? And this—this complete self-

46

defense is what a reasonable person in the same situation as the defendant would do, not what the defendant would do. So it's not subjective."

Counsel for Morgan objected that this argument misstated the law. The court overruled the objection and informed the jury, "Just keep in mind, as I already indicated if the attorneys say something in their arguments that conflicts with my instructions on the law, you're to follow my instructions."

### 2.4.2. Analysis

" '[I]t is improper for the prosecutor to misstate the law generally [citation] . . . . Improper comments violate the federal Constitution when they constitute a pattern of conduct so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process. [Citation.] Improper comments falling short of this test nevertheless constitute misconduct under state law if they involve use of deceptive or reprehensible methods to attempt to persuade either the court or the jury. [Citation.] To establish misconduct, defendant need not show that the prosecutor acted in bad faith." (*People v. Cortez* (2016) 63 Cal.4th 101, 130.) "But a prosecutor is allowed to vigorously argue the case and is afforded 'significant leeway' in discussing the facts and the law in closing argument. [Citations.]" (*People v. Azcona* (2020) 58 Cal.App.5th 504, 516.)

It is a close question whether the prosecutor misstated the law in the portion of her argument identified by Morgan. The prosecutor's statement that the standard is "not subjective" is correct in the sense that the jury must "consider what a reasonable person in a similar situation with similar knowledge would have believed" and cannot conclude that a homicide was justifiable based only on what the defendant subjectively

47

believed. However, to the extent that the prosecutor's argument suggested that the defendant must have been objectively correct about the presence of danger, her argument was contrary to the law. As the instruction states, a danger need not have existed so long as the defendant's beliefs regarding it were reasonable.

Assuming the prosecutor misstated the law, Morgan has failed to show prejudice. He has not demonstrated there is a reasonable probability that the result of the proceeding would have been more favorable to him but for counsel's failure to object. There is no dispute that CALCRIM No. 505 accurately stated the law of justifiable homicide. The jury was instructed that, if the attorneys' comments on the law conflicted with the trial court's instructions, they must follow the law as the trial court explained it to them. The court also reminded the jury of this instruction when the prosecutor made the arguments concerning justifiable homicide to which Morgan's counsel objected. " 'When argument runs counter to instructions given a jury, we will ordinarily conclude that the jury followed the latter and disregarded the former, for "[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade." [Citation.]' " (*People v. Centeno* (2014) 60 Cal.4th 659, 676 (*Centeno*); see also *People v. Cortez, supra*, 63 Cal.4th 101, 131–132 [" 'Juries are warned in advance that counsel's remarks are mere argument, missteps can be challenged when they occur, and juries generally understand that counsel's assertions are the "statements of advocates." ' "].) Finally, the prosecutor's misstatement was brief, and the evidence indicating that Morgan did not act in self-defense was strong.

## 2.5. Statement Pointing Out Morgan's Failure to Remember Details

Morgan argues that the prosecutor committed error by denigrating his failure to remember the details of what happened the day of the murder. This claim is without merit.

### 2.5.1. Additional Background

During closing argument, the prosecutor stated: "There's no corroboration that there was a fifth person inside the house. The only evidence that there was a fifth person inside of [the] house is defendant Harrison's testimony. Even defendant Morgan initially said there was nobody else in the house. When he testified in front of you at trial he also said there was somebody else, but what's interesting is defendant Harrison remembered this person had braids but Morgan could just remember that he was tall. If you're both standing trial because somebody else murdered your homie or tried to murder your homie, you don't remember? You'd remember the details about this person."

### 2.5.2. Analysis

As discussed above, a prosecutor is given wide latitude during argument and may argue vigorously so long as her commentary on the evidence is fair. (*People v. Hill, supra,* 17 Cal.4th at p. 819.) The prosecutor argued that Morgan's inability to describe the purported fifth person in the apartment in any detail called the credibility of his testimony into doubt. This was a fair commentary on the evidence and fell within the wide latitude given to prosecutors during closing argument. (See *People v. Edwards* (2013) 57 Cal.4th 658, 763 [prosecutor's closing argument that defendant's assertion he did not remember the murders should not be credited was fair comment on the state

of the evidence]; see also *People v. Schmeck* (2005) 37 Cal.4th 240, 298 [no misconduct in referring to defendant as a " 'dope dealing lying rat' "]; *People v. Edelbacher* (1989) 47 Cal.3d 983, 1030 [the prosecutor's argument that defendant was a " 'snake in the jungle,' " " 'slick,' " " 'tricky,' " a " 'pathological liar,' " and " 'one of the greatest liars in the history of Fresno County' " was not misconduct].)

### 3.      Harrison's Claims of Prosecutorial Misconduct

Harrison raises three claims of prosecutorial misconduct in connection with statements made by the prosecutor during closing argument. His trial counsel objected to none of these statements during trial. He argues that the claims are nevertheless cognizable and, to the extent they are forfeited, he received ineffective assistance of counsel. We again exercise our discretion to address these claims on the merits. (See *In re Victor L., supra*, 182 Cal.App.4th at p. 928.)

#### 3.1.    Facts Not in Evidence

Harrison contests that the prosecutor argued facts not in evidence when she asserted several times during closing argument that Morgan and Harrison intended to steal from the victim. We conclude that the prosecutor did not err and that any error was not prejudicial.

#### 3.1.1.   Additional Background

The court instructed the jury: "Evidence is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you to consider as evidence. Nothing that the attorneys say is evidence. In their opening statements and closing arguments the attorneys discuss the case but their

remarks are not evidence. Their questions are not evidence. Only the witness's answers are evidence."

At the beginning of her opening argument, the prosecutor argued: "We're here because of the defendants' actions. The two defendants that sat before you throughout this trial chose to conduct a series of actions that they chose themselves. Waking up that morning, setting out to 107th and Main knowing why they were going there, knowing who lived there, knowing what Tap had to offer, and knowing what they wanted to gain. [¶] . . . [¶] They made their way to apartment number five, and they made sure that they didn't leave until they got what they wanted. And what you see, the state that you see this apartment is what they did, ladies and gentlemen."

Later in her opening argument, the prosecutor argued, "[Marvin Tart] says, 'They told me to get in the room so they could handle their business.' This is important because it's consistent with what we know that they went over there with the express intent to rob victim Albert Kyle." She also stated: "Did they think about their decision before they went into Mr. Kyle's house to kill him? Did they think about what they were doing every time they stabbed or shot at him. Absolutely. How do we know that? They armed themselves with weapons before they left . . . . They went there together knowing that they were going there to get the drugs and to leave without paying for the drugs." Finally, she asserted that the defendants' version of events was not plausible and that, "[o]n May 26th, 2018, the two of them went there with the express intent to take advantage of Tap, to leave with what they could. And when they couldn't get what they wanted, they killed him."

During the rebuttal argument, the prosecutor asserted: "We know that they went there together from defendant Morgan's mother's home. They left her home, and they went there together with a plan . . . . [¶] We know that they went there to rob him because their actions were coordinated. Once the drugs were turned over, defendant Harrison went in the back with the victim, and that's where the stabbing began and defendant Morgan always stayed in the front and looked, remained as a lookout. Their actions were coordinated, and the drugs were gone. [¶] Defendant Morgan said in his statement to the defendant [*sic*] that Tap pulled out the drugs, pulled out the drugs and gun and was staring at him while he was divvying up the drugs. That's what he told Detective Flaherty in the statement. So where were the drugs?"

### 3.1.2. Analysis

"A prosecutor engages in misconduct by misstating facts or referring to facts not in evidence, but he or she enjoys wide latitude in commenting on the evidence, including urging the jury to make reasonable inferences and deductions therefrom. [Citation.]" (*People v. Ellison* (2011) 196 Cal.App.4th 1342, 1353; *People v. Farnam* (2002) 28 Cal.4th 107, 169 (*Farnam*) [" 'Prosecutors have wide latitude to discuss and draw inferences from the evidence at trial.' [Citation.] 'Whether the inferences the prosecutor draws are reasonable is for the jury to decide.' [Citation.]"].)

In *Farnam*, the defendant argued that the prosecutor misstated evidentiary facts and misled the jury on whether the victim's killing was premeditated and deliberate. (*Farnam*, *supra*, 28 Cal.4th at p. 169.) The evidence showed that the victim had telephoned a friend for an hour prior to the attack. (*Ibid.*)

The victim's children testified that she would use the telephone in the living room downstairs for long calls and often left the living room screen door open and the curtains to that door partially open. (*Id.* at pp. 169–170.) The interior of the living room was visible from street level. (*Id.* at p. 170.) The evidence further supported that the telephone cords had been cut, the victim had been attacked on the upstairs level of the residence, and the lower rooms (which contained entertainment equipment and envelopes of cash) "were relatively undisturbed despite the intruder's entry through the living room screen door." (*Ibid.*) "On this record, [the court could not] say that the prosecutor acted improperly in presenting her theory of premeditation and deliberation by arguing that defendant, from the street, watched the victim through open curtains in her living room and waited for an opportune time to enter the residence to commit a planned sexual attack and murder. [Citation.] The argument was neither deceptive nor reprehensible. [Citation.]" (*Ibid.*)

We similarly conclude the prosecutor acted within the wide latitude permitted to her in presenting her theory concerning the defendants' motive. As in *Farnam*, the prosecutor relied on evidence in the record to support the inference that the attack on Kyle took place in connection with a robbery, including the testimony of Tart and Morgan, which supported that the defendants had drug-related business with the victim and drugs were present.

Even if we determined that the prosecutor's statements constituted misconduct, Harrison has failed to establish the existence of any prejudice. Shortly before the prosecutor began her closing argument, the court instructed the jury that the arguments made by counsel are not evidence. "We presume jurors

'generally understand and follow instructions.' [Citation.]"
(*People v. Myles* (2012) 53 Cal.4th 1181, 1212.) We have no reason
to believe that the jury would have been persuaded by the
prosecutor's theory even if it concluded the theory had no basis in
the evidence presented at trial.

### 3.2. Prosecutor's Purported Misstatement of the Law Concerning Premeditation and Deliberation

Harrison further contends that the prosecutor's analogy of
premeditation and deliberation to the decision to go through a
stop sign was prejudicial error, and that the prosecutor's
argument improperly conflated intent with deliberation and
premeditation. We perceive no error.

### 3.2.1. Additional Background

As discussed above, the jury was instructed to follow the
law given to it by the court, even if the comments of the attorneys
conflicted with the court's instruction.

With respect to first degree murder, the jury was instructed
with CALCRIM No. 521, which states in relevant part: "The
defendant is guilty of first degree murder if the People have
proved that he acted willfully, deliberately, and with
premeditation. The defendant acted willfully if he intended to
kill. The defendant acted deliberately if he carefully weighed the
considerations for and against his choice and, knowing the
consequences, decided to kill. The defendant acted with
premeditation if he decided to kill before completing the acts that
caused death. [¶] The length of time the person spends
considering whether to kill does not alone determine whether the
killing is deliberate and premeditated . . . . A decision to kill
made rashly, impulsively, or without careful consideration is not

54

deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time."

During closing argument, the prosecutor analogized premeditation to the decision-making process one makes when coming to a stop sign: "And so the example I use to explain [premeditation] is coming to a stop sign. We come to a stop, and we stop. When we stop, we weigh all the consequences of whether or not we should move forward. We look left. We look right. We look for pedestrians. We look for oncoming cars. We're deliberating. Should we move forward. Once we've weighed all those consequences and deliberated that it's safe because there are no pedestrians, there are no cars, we then choose to move forward by actually putting our foot on the gas. So now we've premeditated. We've decided to move forward before taking the action to actually move forward."

The prosecutor further explained: "Now, the decision to kill an individual while similar is not the same as obviously coming to a stop sign because you're killing a human being. That has dire consequences. So I'm not saying it's identical. What I'm saying is we actually deliberate, premeditate decisions in our everyday life all the time. The law doesn't say you have to have thought about it for a day, two days, 15 days or ten seconds. What the law is saying is a cold, calculated decision can be reached quickly." The prosecutor explained that premeditation is covered in CALCRIM No. 521, which they would have a chance to review while deliberating.

While discussing the requirements of first degree murder in the context of the evidence, the prosecutor argued: "Defendant Harrison didn't just stab [the victim] once, not twice, not three

times, not four times, not five, not six. I could go on. But fifteen times. You think he didn't know what he was doing? You think you take that knife you stab into a human being in vital areas puncturing their lungs that you're not killing them? Not a warning shot in the air. Not a warning shot in his leg. Directly into his back, puncturing his lung." Defense counsel did not object to these arguments.

### 3.2.2. Analysis

Harrison argues that *Boatman*, *supra*, 221 Cal.App.4th 1253 demonstrates that the prosecutor misstated the law when she relied on a stop sign analogy to illustrate the concepts of premeditation and deliberation. As discussed above, the defendant in *Boatman* killed his girlfriend by shooting her a single time in the face. (*Id.* at p. 1258.) The court in *Boatman* rejected the contention that premeditation and deliberation were established because the evidence supported an inference that the defendant "took the time to pull back the hammer, point the pistol at [the victim's] face, and fire the weapon." (*Id.* at p. 1273.) The court noted that "cocking, aiming, and firing a revolver essentially describes the act of shooting with a revolver. If these actions could, without more, constitute premeditation and deliberation, we would effectively add killing perpetrated by a revolver to the list of crimes specifically enumerated in section 189 and thereby substantially broaden the scope of first degree murder and eliminate the purposeful division created by the Legislature." (*Id.* at p. 1274, fn. 4.)

Harrison argues that *Boatman* supports that the physical act of firing a gun is insufficient to establish premeditation and that the decision to go through a stop sign is a comparably instinctual action. Harrison contends that, "[a]s jurors who were

not subject to the prosecutor's improper arguments would likely recognize from their own personal experience, stopping at, pausing, or rolling through a stop sign does not require 'careful consideration and examination' or 'engaging in reflection' about possible dire consequences." We disagree. Although the prosecutor used "we" in her explanation, she did not suggest that everyone who has ever stopped at a stop sign and decided to pass through has done so in a premeditated and deliberate manner. Rather, the prosecutor described various assessments that a driver may make at a stop sign and argued that a driver who runs through this mental checklist and decides to move forward has premeditated that decision and acted deliberately. The prosecutor did not argue that a person who does not pause to consider any of the risks and instead blindly or instinctively rolls through the stop sign has acted in a premeditated manner. Thus, the stop sign analogy illustrated how a premeditated and deliberate decision to kill could happen quickly, but that premeditation and deliberation nevertheless require at least some degree of weighing the consequences. This analogy accurately reflects the law in that a defendant can quickly make a deliberate, premeditated decision to kill. (*People v. Solomon* (2010) 49 Cal.4th 792, 812 [" ' "Premeditation and deliberation can occur in a brief interval" ' "].)

The prosecutor's stop sign analogy is comparable to yellow light analogies that have consistently been found proper. (See *People v. Avila* (2009) 46 Cal.4th 680, 715; *People v. Son* (2020) 56 Cal.App.5th 689, 698–700; *People v. Azcona, supra*, 58 Cal.App.5th at pp. 516–517.) For example, in *Avila*, the Supreme Court rejected the defendant's contention that the prosecutor had argued "that 'the "cold, calculated" judgment of murder is the

equivalent of deciding whether to stop at a yellow light or proceed through the intersection.' Rather, the prosecutor used the example of assessing one's distance from a traffic light, and the location of surrounding vehicles, when it appears the light will soon turn yellow and then red, and then determining based on this information whether to proceed through the intersection when the light does turn yellow, as an example of a 'quick judgment' that is nonetheless 'cold' and 'calculated.' He then immediately said, 'Deciding to and moving forward with the decision to kill is similar, but I'm not going to say in any way it's the same. There's great dire consequences that have a difference here.' " The court therefore concluded that the prosecutor had not engaged in any misconduct. (*Avila,* at p. 715.)

Harrison concedes that, as in *Avila,* the prosecutor made clear that she was not suggesting that deciding to pass through a stop sign and the decision to kill are of similar weight, but instead that both can involve cold and calculated decision making achieved in a short amount of time. He nevertheless argues that the prosecutor improperly suggested "that [the jury] could decide the issue of premeditation and deliberation by comparing that process to their own everyday decision-making, including their thought process at a stop sign." We see nothing improper about this. *Avila* supports that a prosecutor may analogize to everyday decision-making to help the jury understand the concept of premeditation, so long as she does not misrepresent the law while doing so.

Citing *Centeno*, *supra,* 60 Cal.4th at page 671, Harrison argues that "[c]ounsel trying to clarify the jury's task by relating it to a more common experience must not imply that the task is less rigorous than the law requires." Although we do not dispute

this general proposition, *Centeno* does not assist Harrison. In *Centeno*, the prosecutor attempted to illustrate the People's burden of proof by showing the jury an outline of the state of California and posited a hypothetical criminal trial in which the issue was, " '[W]hat state is this[?]' " (*Id.* at p. 665.) The prosecutor described the testimony of hypothetical witnesses who imparted some accurate information but also some incomplete or inaccurate information about the state. (*Ibid.*) She then argued that regardless of the incomplete, inaccurate, or missing information, the jury could " 'still reach a decision beyond a reasonable doubt' "that the state was California. (*Ibid.*) The court reasoned that the "use of an iconic image like the shape of California . . . [was] a flawed way to demonstrate the process of proving guilt beyond a reasonable doubt." (*Id.* at p. 669.) The image and the hypothetical drew on the jurors' preexisting knowledge rather than on the evidence, trivialized the deliberative process, encouraged the jurors to guess or to jump to a conclusion, and thus misstated the burden of proof. (*Id.* at pp. 669–671.) Harrison has failed to demonstrate that the stop sign metaphor suggests that it was a foregone conclusion that Harrison's killing of Kyle was willful, deliberate, and premeditated.

Turning to Harrison's second contention, we do not agree that the prosecutor improperly conflated the issues of premeditation and intent. First, it is not clear that the prosecutor was speaking to the issue of premeditation during the portion of argument Harrison argues was improper. Even if she was, her argument that the fact that the victim was stabbed 15 times supports a finding of premeditation was not inconsistent with the law. As discussed above, evidence that a defendant has inflicted

59

multiple fatal wounds on the victim can support a finding of premeditation. (See, e.g., *Morales, supra,* 10 Cal.5th at p. 102; *People v. Pride, supra,* 3 Cal.4th at p. 247; *People v. Alcala, supra,* 36 Cal.3d at p. 627.) Although Harrison is correct that an intentional act need not be premeditated, the situation here is not comparable to *Boatman,* on which he once again relies. The defendant in *Boatman* shot his girlfriend a single time. Here, the victim was stabbed 16 times and four of the wounds, including two inflicted to the victim's back, were fatal. Considering the vastly different facts, we do not find *Boatman* instructive as to whether the prosecutor could fairly argue that the circumstances of the stabbing were indicative not only of intent, but of premeditation. (See *People v. Williams* (2018) 23 Cal.App.5th 396, 411 [*Boatman* was "not at all similar" to case where "victim was stabbed twice in the neck, had a defensive cut on her thumb, and had recent blunt force injuries"].)

Even if we assumed error with respect to either contention, Harrison has failed to show prejudice. He has not demonstrated there is a reasonable probability that the result of the proceeding would have been more favorable to him but for counsel's failure to object to these portions of the prosecutor's closing argument. The court correctly instructed the jury on the concept of premeditation and deliberation and told the jury that they must follow the law as the trial court explained it to them. We presume the jury followed the law as instructed. (*Centeno, supra,* 60 Cal.4th at p. 676.)

### 3.3. Prosecutor's Purported Misstatement of the "Beyond a Reasonable Doubt" Standard

Finally, Harrison contends that the prosecutor misrepresented her burden of proof during closing argument. We conclude that any error was harmless.

### 3.3.1. Additional Background

With respect to proof beyond a reasonable doubt, the court instructed the jury with CALCRIM No. 220. In relevant part, CALCRIM No. 220 provides: "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt. [¶] Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt. [¶] In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendants guilty beyond a reasonable doubt, they are entitled to an acquittal and you must find them not guilty." As we have discussed, the court further instructed the jury that it must follow the law as the court explained it and, if the attorneys' comments on the law were in conflict with the court's instructions, it must follow the court's instructions.

Counsel for Morgan addressed the prosecution's burden and proof beyond a reasonable doubt at length in his closing argument, including by rereading portions of CALCRIM No. 220.

During her rebuttal argument, the prosecutor stated: "Do you have a reasonable doubt as to what happened? Find the defendants not guilty. But you always have to ask yourselves, what's reasonable. Just because you hear two stories, two, different stories, that doesn't automatically equal reasonable doubt. You still determine which one you believe to be reasonable."

### 3.3.2. Analysis

"Section 1096, codifying the standard of proof, expressly provides that a 'reasonable' doubt is not a mere ' "possible" ' or ' "imaginary" ' doubt." (*Centeno, supra,* 60 Cal.4th at p. 672.) The Supreme Court has therefore approved a "prosecutor's argument that the jury must ' "decide what is reasonable to believe versus unreasonable to believe" and to "accept the reasonable and reject the unreasonable." ' [Citation.]" (*Ibid.*) " 'The prosecution must prove the case beyond a reasonable doubt, not beyond an unreasonable doubt.' [Citation.]" (*Ibid.*) "Conversely, it is error for the prosecutor to suggest that a 'reasonable' account of the evidence sa*tisfies the prosecutor's burden of proof.*" (*Ibid.*)

The first four sentences of the portion of the prosecutor's closing argument cited by Harrison are unobjectionable. They constitute a permissible statement that a jury may reject unreasonable explanations for the defendants' conduct and need not conclude that any unreasonable story offered by a defendant is sufficient to create a reasonable doubt. However, we agree that the final sentence could suggest to the jury that prosecutor met her burden if she offered a reasonable explanation for what happened, or at least the *more* reasonable explanation.

In evaluating the degree of prejudice arising from a prosecutor's misstatements of the law, courts may consider

whether the misstatements were fleeting or pervasive, whether the evidence of the defendant's guilt on the issue affected by the misstatement was close or overwhelming, and whether other jury instructions obviated the effect of the error. (See *People v. Fayed* (2020) 9 Cal.5th 147, 205; *People v. Cortez, supra*, 63 Cal.4th 101, 133–134; *People v. Otero* (2012) 210 Cal.App.4th 865, 873; *People v. Bryden* (1998) 63 Cal.App.4th 159, 182.)

We conclude that each of these considerations supports that any error was harmless. The misstatement was not a running theme of the prosecutor's argument but was fleeting. The court properly instructed the jury on the standard of proof beyond a reasonable doubt and counsel for Morgan also discussed the standard at length during his argument. The court also instructed the jury that it must follow the court's instructions if any of the attorneys' comments conflicted with the jury instructions given. The court reiterated that the jury must follow its instructions during the prosecutor's closing argument and the prosecutor stated that the jurors would have access to the law and that they did not have to accept the law as she explained it.

Unlike *Centeno*, on which Harrison relies*, this was not a very close case that depended on the testimony of a single witness. In *Centeno*, the prosecutor repeatedly asked the jury if it was *more* reasonable to believe the defendant or the victim as to various aspects of the case, and urged the jury to conclude the defendant was "good for" the charged crimes because "that is what is reasonable." (*Centeno, supra*, 60 Cal.4th at pp. 671–672.) The prosecutor also used a visual aid and hypothetical which, together, encouraged the jurors to guess or to jump to a conclusion, and thus misstated the burden of proof. (*Id*. at pp. 669–671.) Further, *Centeno* was a "a very close case"

63

concerning an alleged molestation. (*Id.* at p. 677.) "The prosecution depended almost entirely on Jane Doe's credibility, which was called into question in several respects," including because her trial testimony was inconsistent with her forensic interview testimony and she did not answer any of defense counsel's questions about the alleged touching. (*Ibid.*)

The case against Harrison was strong. When Harrison was arrested, he had a bloody knife in his pocket that had DNA matching Kyle's, and samples taken from blood stains on his shoes also matched Kyle's DNA. Moreover, Morgan initially told detectives that he saw Harrison fighting with Kyle. The defense theory that a fifth man was present was not supported by any evidence other than the defendants' testimony. Thus, it is not reasonably probable that a result more favorable to Harrison would have been reached absent the prosecutor's misstatement of the law.

### 4.    Cumulative Prejudice

Morgan and Harrison contend that the cumulative effect of the errors they have raised undermined the fundamental fairness of the trial and that reversal is therefore required. We disagree. Defendants have " ' "demonstrated few errors, and we have found each error or possible error to be harmless when considered separately. Considering them together, we likewise conclude that their cumulative effect does not warrant reversal of the judgment." [Citation].' " (*People v. DeHoyos* (2013) 57 Cal.4th 79, 155.)

### 5.    Morgan's Claims of Instructional Error

Morgan further contends that the court prejudicially erred in failing to instruct the jury on voluntary manslaughter based

on heat of passion and that provocation can negate premeditation and deliberation. We conclude that the court did not err in either respect.

### 5.1.  Standard of Review

" 'We review a claim of instructional error de novo.' [Citation.] A trial court 'is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request.' [Citation.]" (*People v. Parker* (2022) 13 Cal.5th 1, 66.)

### 5.2.  The court did not err in not instructing the jury on voluntary manslaughter based on heat of passion.

### 5.2.1.  Additional Background

The court instructed the jury on second degree murder, first degree premeditated murder and, as to Morgan, self-defense and imperfect self-defense voluntary manslaughter. The instruction for first degree murder made clear that, if the People had failed to prove beyond a reasonable doubt that the killing was committed willfully, deliberately, and with premeditation, they must find the defendant not guilty and conclude that the murder is second degree murder. Similarly, the jury was instructed that the People have the burden of proving beyond a reasonable doubt that the killing was not justified and that the defendant was not acting in imperfect self-defense. If the People failed to meet that burden, the jury was instructed to find defendant not guilty of murder.

### 5.2.2. Analysis

"The trial court has a duty to instruct the jury sua sponte on all lesser included offenses if there is substantial evidence from which a jury can reasonably conclude the defendant committed the lesser, uncharged offense, but not the greater." (*People v. Brothers* (2015) 236 Cal.App.4th 24, 29.)

" ' "Manslaughter, an unlawful killing without malice, is a lesser included offense of murder." [Citations.] "Although [Penal Code] section 192, subdivision (a), refers to 'sudden quarrel or heat of passion,' the factor which distinguishes the 'heat of passion' form of voluntary manslaughter from murder is provocation." ' [Citation.] 'To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply react, without reflection . . . . [T]he anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene.' [Citation.] ' " '[I]f sufficient time has elapsed for the passions of an ordinarily reasonable person to cool, the killing is murder, not manslaughter.' " ' [Citation.]" (*People v. Rangel* (2016) 62 Cal.4th 1192, 1225; cf. *People v. Lee* (1999) 20 Cal.4th 47, 59 ["provocative conduct by the victim may be physical or verbal, but . . . must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection"].) Because "[t]he test of adequate provocation is an objective one," the fact that a defendant was intoxicated and thus may have been prone to emotional instability or lacked critical judgment is not relevant; rather, "[t]he provocation must be such that an *average, sober person* would be so inflamed that he or she would lose reason and judgment." (*Lee*, at pp. 59–60, italics added.) Further,

66

"[p]redictable and reasonable conduct by a victim resisting felonious assault is not sufficient provocation to merit an instruction on voluntary manslaughter. [Citations.]" (*People v. Enraca* (2012) 53 Cal.4th 735, 760.)

We will assume for the sake of argument that Morgan's testimony that "[i]nstinct kicked in" and he acted according to a "[f]ight or flight" response constitutes substantial evidence that Morgan was so overcome by fear that his " 'reaction bypassed his thought process to such an extent that judgment could not and did not intervene.' [Citation.]" (*People v. Rangel, supra*, 62 Cal.4th at p. 1225.) However, we doubt whether the average person would be so overcome by the sight of an unarmed and mortally wounded man as to lose reason and judgment and shoot instinctively. We also consider Kyle's conduct and demeanor at the time he was shot to be "[p]redictable and reasonable conduct by a victim resisting felonious assault," and thus insufficient provocation to merit an instruction on voluntary manslaughter. (*People v. Enraca, supra*, 53 Cal.4th at p. 760.) Nevertheless, we will further assume for the sake of argument that there was substantial evidence to support that the objective requirement was also satisfied.

Morgan argues that we must apply the federal constitutional standard for assessing prejudice, which requires reversal unless it appears beyond a reasonable doubt that an error did not contribute to the verdict, applies to this claim. (*Chapman v. California, supra*, 386 U.S. at p. 24.) The Attorney General argues that any error was harmless under either the federal standard or the state constitutional standard, which requires reversal only if there is a reasonable probability that the

error contributed to the verdict. We agree that any error was harmless even under the more stringent *Chapman* standard.

"[I]n some circumstances it is possible to determine that although an instruction on a lesser included offense was erroneously omitted, the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions. In such cases the issue should not be deemed to have been removed from the jury's consideration since it has been resolved in another context, and there can be no prejudice to the defendant since the evidence that would support a finding that only the lesser offense was committed has been rejected by the jury." (*People v. Sedeno* (1974) 10 Cal.3d 703, 721, abrogated on other grounds in *People v. Breverman* (1998) 19 Cal.4th 142.) In other words, "[e]rror in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to [the] defendant under other properly given instructions." (*People v. Lewis* (2001) 25 Cal.4th 610, 646.)

The jury here found Morgan guilty of first degree murder. "By finding defendant was guilty of first degree murder, the jury necessarily found defendant premeditated and deliberated the killing. This state of mind, involving planning and deliberate action, is manifestly inconsistent with having acted under the heat of passion—even if that state of mind was achieved after a considerable period of provocatory conduct—and clearly demonstrates that defendant was not prejudiced by the failure to give his requested instruction." (*People v. Wharton* (1991) 53 Cal.3d 522, 572; *People v. Peau* (2015) 236 Cal.App.4th 823, 832 ["failure to give a heat-of-passion instruction here was harmless

beyond a reasonable doubt because the jury found that [defendant's] murder was willful, deliberate, and premeditated"].)

*People v. Manriquez* (2005) 37 Cal.4th 547 is also instructive. The defendant in that case contended that the trial court's refusal to instruct the jury on voluntary manslaughter constituted reversible error. (*Id.* at p. 583.) The court concluded that the record supported that the outcome would have been the same even if the instruction had been given. (*Id.* at p. 586.) The court gave "pattern instructions informing the jurors that if they harbored a reasonable doubt as to whether defendant committed first degree or second degree murder, or harbored a reasonable doubt as to whether the killing was murder or manslaughter, they must give defendant the benefit of the doubt and return a verdict of guilty of the lesser offense." (*Ibid.*) The court therefore "conclude[d] the jury would have returned the same verdict of first degree murder . . . even if the voluntary manslaughter instruction refused by the trial court had been given." (*Ibid.*) "Accordingly, even if [the court] were to assume for the sake of discussion that the trial court erred in refusing the instruction requested by defendant, any error clearly would have been harmless. [Citation.]" (*Ibid.*)

Similarly, the court here instructed the jury that it must find that murder was second degree murder if it had any reasonable doubt as to whether the murder was willful, deliberate, and premeditated. If the jury had any reasonable doubt as to whether the killing was justified or whether Morgan was acting in imperfect self-defense, it was required to find that he had not committed murder. Because the jury returned a first degree murder verdict for both defendants, we conclude that the

jury did not harbor any reasonable doubt as to whether the defendants acted coldly and deliberately.

We reject Morgan's contention that *People v. Wharton*, *supra*, 53 Cal.3d 522 and *People v. Peau*, *supra*, 236 Cal.App.4th 823 do not assist the Attorney General because other instructions were given in those cases relating to the issue of heat of passion. It was clear from the court's instructions here that the jury should not find Morgan guilty of first degree murder if it had any reasonable doubt as to whether he had acted "rashly, impulsively, or without careful consideration," as one overcome with fear or emotion would. We also find Morgan's reliance on *People v. Millbrook* (2014) 222 Cal.App.4th 1122 and *People v. Dominguez* (2021) 66 Cal.App.5th 163 unavailing. In *Millbrook*, the jury did *not* find that the attempted murder was willful, premeditated, and deliberate, which "would have been 'manifestly inconsistent with having acted under the heat of passion.' [Citation.]" (*Millbrook*, at p. 1138.) In the absence of such a finding, the court "observe[d] that there is nothing in the jury's verdict that is inconsistent with the need for a heat-of-passion instruction." (*Ibid*.) In *Dominguez*, the jury "acquitted Defendants on first degree premeditated murder and found 'not true' that the attempted murders were 'willful, deliberate and premeditated,' " and thus "rejected the People's theory of a planned ambush, and seemingly accepted that Defendants were provoked in some degree or manner." (*Dominguez*, at p. 184.)

Morgan cites *People v. Sedeno*, *supra*, 10 Cal.3d 703, for the proposition that substantial evidence does not support the jury's finding of guilt as to the issue resolved against him. *Sedeno* does not support his claim. The court in *Sedeno* concluded that there was substantial evidence to support that the killing in that case

was deliberate. (*Id.* at p. 711.) When addressing the court's failure to instruct on involuntary manslaughter, the court observed that "the jury necessarily rejected defendant's evidence that his diminished capacity negated intent to kill when it found the shooting to be first degree rather than second degree murder" and that "the failure to give an instruction on involuntary manslaughter could not have been prejudicial to defendant since the offense could have been no less than voluntary manslaughter." (*Id.* at p. 721.) However, because the trial court's instructions had implied that, if the jury found that the death occurred during the commission of an escape, they must conclude that the crime was at least second degree murder, the jury did not necessarily make a finding of malice. (*Id.* at p. 722.) The Supreme Court reversed on this ground. (*Id.* at p. 724.) Morgan identifies no comparable confusion in the instructions given by the trial court here.

In sum, we conclude that any error was harmless beyond a reasonable doubt because "[w]e cannot see how a determination that [Morgan] carefully weighed his choice to act and did not decide rashly or impulsively can coexist with the heat of passion, which 'arises when "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act *rashly and without deliberation* and reflection, and from such passion rather than from judgment." ' [Citation.]" (*People v. Franklin* (2018) 21 Cal.App.5th 881, 894.)

71

**5.3. The court did not err in failing to sua sponte instruct the jury with CALCRIM No. 522 and Morgan was not prejudiced by the fact it was not given.**

Morgan argues that the court erred in not instructing the jury with CALCRIM No. 522, which provides: "Provocation may reduce a murder from first degree to second degree [and may reduce a murder to manslaughter]. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. [Also, consider the provocation in deciding whether the defendant committed murder or manslaughter.] [¶] [Provocation does not apply to a prosecution under a theory of felony murder.]" We hold that there was no error.

"Provocation may indeed reduce murder from first to second degree. [Citation.] But an instruction that provocation may be sufficient to raise reasonable doubt about premeditation or deliberation, such as CALJIC No. 8.73 or CALCRIM No. 522, is a pinpoint instruction to which a defendant is entitled only upon request where evidence supports the theory. [Citation.] The trial court is not required to give such an instruction sua sponte. [Citation.] In this case, [the defendant] did not make a request for an instruction on provocation. The trial court did not err by failing to so instruct the jury." (*People v. Rivera* (2019) 7 Cal.5th 306, 328–329; cf. *People v. Rogers* (2006) 39 Cal.4th 826, 878 (*Rogers*) [CALJIC No. 8.73, analogue to CALCRIM No. 522, is a pinpoint instruction and need not be given on court's own motion].)

Neither *People v. Thomas* (1945) 25 Cal.2d 880 nor *People v. Valentine* (1946) 28 Cal.2d 121, on which Morgan relies, are instructive here. In both cases, multiple erroneous instructions were given: "(1) The jury were told that the existence of a specific intent to kill (which, of course, exists in voluntary manslaughter and in second degree murder as well as in some types of first degree murder) constitutes a homicide murder of the first degree; (2) the effect of provocation and passion as reducing the class of a homicide from murder to manslaughter was emphasized and the effect of provocation and passion as possibly precluding or making doubtful the formation of a deliberate and premeditated intent to kill was ignored; and (3) the jury were told, in effect, that the burden of proving circumstances which would mitigate the offense from murder of the first to murder of the second degree was upon the defendant." (*Valentine,* at pp. 130–131, citing *Thomas*; see also *Rogers, supra,* 39 Cal.4th at pp. 879–880 [conclusion that CALJIC No. 8.73 is a pinpoint instruction is not inconsistent with *Valentine,* where the court "reversed based on a host of instructional errors"].)

Morgan does not contend that any comparable errors are present in this case. "In the absence of instructional errors such as were present in *Valentine,* the standard manslaughter instruction is not misleading, because the jury is told that premeditation and deliberation is the factor distinguishing first and second degree murder. Further, the manslaughter instruction does not preclude the defense from arguing that provocation played a role in preventing the defendant from premeditating and deliberating; nor does it preclude the jury from giving weight to any evidence of provocation in determining whether premeditation existed." (*Rogers, supra,* 39 Cal.4th at

p. 880.) Thus, we hold that there was no error in failing to instruct the jury with CALCRIM No. 522.

Morgan argues that, if the court did not commit error in failing to instruct the jury with CALCRIM No. 522, he received ineffective assistance of counsel because his attorney did not request the instruction. To resolve the ineffective assistance of counsel claim, we need not determine whether his counsel's performance was deficient. " 'If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed.' [Citation.]" (*People v. Jacobs* (2013) 220 Cal.App.4th 67, 75.) We find no prejudice.

The jury was correctly instructed that Morgan could not be guilty of first degree murder unless he deliberated and premeditated. CALCRIM No. 522 is "relevant only to the extent it 'bears on the question' whether defendant premeditated and deliberated" and thus merely elaborates on how the first degree murder instructions apply to the evidence. (*Rogers*, *supra*, 39 Cal.4th at pp. 878–879.) By finding Morgan guilty of first degree murder, the jury necessarily rejected that any provocation by Kyle negated deliberation and premeditation. The requisite showing of prejudice is lacking since the record shows no reasonable probability that, even if his attorney had requested CALCRIM No. 522, the result of the proceeding would have been more favorable to Morgan.

**6. Morgan's Claim of Error under Section 654**

Section 654 "prohibits multiple punishments for a single act or course of conduct. [Citation.] Whether an offense is an indivisible course of conduct is a fact question. We uphold the trial court's ruling when substantial evidence supports it.

74

[Citations.] This standard of review is exceedingly deferential. [Citation.]" (*People v. Venegas* (2020) 44 Cal.App.5th 32, 38.)

Morgan contends that the acts underlying counts 2 and 3, possession of firearm by felon (§ 29800, subd. (a)(1)), and unlawful possession of ammunition (§ 30305, subd. (a)(1)), took place during the same course of conduct as Morgan's murder of Kyle, and that the court violated section 654 by imposing sentences for counts 2 and 3. He further argues that, under Assembly Bill No. 518, he was no longer required to be punished under the provision that provided for the longest possible term (i.e., murder under § 187, subd. (a); count 1) but could be punished under the shorter terms for possession of firearm by felon or unlawful possession of ammunition, and that we should therefore remand for resentencing.

We conclude that there is substantial evidence that Morgan purposefully took possession of the pistol before the murder took place and that the court did not err in failing to stay the sentence for count 2. However, we accept the Attorney General's concession that the sentence for count 3 should have been stayed because it was part of the same course of action as count 2. We conclude that a remand for resentencing is not required.

### 6.1.   Failure to Stay Punishment for Possession of Firearm by Felon (Count 2)

"With respect to additional punishment for possessing a gun, the conduct is divisible, and additional punishment therefore proper, so long as [the defendant] purposefully possessed the gun before the murder took place. [Citation.]" (*People v. Venegas, supra*, 44 Cal.App.5th at p. 38; see, e.g., *People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1378–1379 [defendant who arrived at the scene of a kidnapping already in

possession of firearm was properly subject to separate punishments]; *People v. Jones* (2002) 103 Cal.App.4th 1139 (*Jones*), 1147–1148 [defendant who drove to ex-girlfriend's home in possession of gun and then shot into the home 15 minutes later was properly subject to separate punishments].)

However, "multiple punishment is improper where the evidence 'demonstrates at most that fortuitous circumstances put the firearm in the defendant's hand only at the instant of committing another offense . . . .' [Citation.]" (*Jones, supra,* 103 Cal.App.4th at p. 1144.) For example, where a defendant wrested a gun away from a highway officer and shot at the officer, our Supreme Court found punishment for both assault with a deadly weapon upon a peace officer and possession of a firearm by an ex-felon was prohibited by section 654. (*People v. Bradford* (1976) 17 Cal.3d 8, 13, 22–23.) Similarly, in a case where the defendant shot a companion at a bar and the evidence suggested that the defendant obtained the gun during a struggle at the bar moments before the shooting, section 654 barred punishment for possession of a firearm by an ex-felon in addition to punishment for assault with a deadly weapon because "the possession [was] physically simultaneous" and "was incidental to only one objective, namely to shoot [the victim]." (*People v. Venegas* (1970) 10 Cal.App.3d 814, 818–821.)

Morgan argues that there is no evidence to support that he arrived at the scene armed with a gun. According to his testimony, he fortuitously came across the gun after Kyle placed it on the ottoman. However, we review the trial court's determination in the light most favorable to the respondent, presume the existence of every fact the trial court could reasonably deduce from the evidence, and will not reverse if there

is any substantial evidence to support the finding. (*Jones, supra*, 103 Cal.App.4th at p. 1143.) Even accepting Morgan's account of events, the evidence does not suggest that Morgan wrested the gun from Kyle and simultaneously shot him. Morgan testified that, while the others present were fighting, he picked up the gun from where it was sitting on the ottoman, exited the apartment, and stood outside on the walkway. At that point in time, he had no reason to expect that Kyle, who was by all accounts the victim of the brutal attack, would come towards him in a threatening manner. Thus, a rational trier of fact could conclude that his possession of the gun was not "physically simultaneous" and incidental to the objective of shooting Kyle. (*People v. Venegas, supra*, 10 Cal.App.3d at p. 821.)

Moreover, the trier of fact could reasonably discredit Morgan's testimony that Kyle left a gun sitting out for the taking. Tart told detectives that Morgan and Harrison told him "to go to the front while they handle their business," and that he later heard one of them say, "Shoot this motherfucker. Don't let him out." The court could reasonably infer that Harrison instructed Morgan to shoot Kyle because he knew that Morgan had armed himself with a gun before coming to Kyle's apartment.[5] Thus, under the deferential standard of review, we conclude multiple punishment for the murder and for possession of a firearm was proper in this case.

---

[5] Morgan's assertion that the only DNA located on the gun was Kyle's does not rule out the possibility that Morgan brought the gun to Kyle's apartment. The DNA from the gun handle was inconclusive; the DNA matching Kyle's DNA came from a blood stain on the gun. That Kyle's blood was on the gun is not a particularly strong indicator that he owned the gun, much less a conclusive one.

### 6.2. Failure to Stay Punishment for Unlawful Possession of Ammunition (Count 3)

We accept the Attorney General's concession that multiple punishment for possession of a firearm by a felon (count 2) and unlawful possession of ammunition (count 3) was not proper.

"While there may be instances when multiple punishment is lawful for possession of a firearm and ammunition, the instant case is not one of them. Where, as here, all of the ammunition is loaded into the firearm, and 'indivisible course of conduct' is present and section 654 precludes multiple punishment." (*People v. Lopez* (2004) 119 Cal.App.4th 132, 138.) There is no evidence that supports an inference that Morgan had different or multiple objectives in possessing the loaded pistol and possessing the ammunition. Indeed, the prosecutor argued with respect to possession of ammunition, "[W]e know he did because the gun was loaded. So if he's possessing the gun, the ammunition is inside. He's possessing that as well. He knew he had the ammunition. He knew the gun was loaded." Thus, the trial court erred in failing to stay the sentence for either count 2 or count 3 under section 654.

### 6.3. Assembly Bill No. 518's Amendment to Section 654

"At the time of sentencing, section 654, former subdivision (a) required that a defendant who committed an act punishable by two or more provisions of law be punished under the provision that provided for the longest possible term. (Stats. 1997, ch. 410, § 1.) Effective January 1, 2022, Assembly Bill 518 amended section 654, subdivision (a) to permit an act or omission punishable under two or more provisions of law to 'be punished under either of such provisions.' (§ 654, subd. (a); Stats. 2021,

ch. 441, § 1.) Thus, under newly amended section 654, a trial court is no longer required to punish under the longest possible term of imprisonment when multiple offenses are based on the same act or omission. [Citation.] Section 654 'now provides the trial court with discretion to impose and execute the sentence of either term, which could result in the trial court imposing and executing the shorter sentence rather than the longer sentence.' [Citation.]" (*People v. White* (2022) 86 Cal.App.5th 1229, 1236.) As the parties here agree, "Assembly Bill 518 'applies retroactively to defendants . . . whose convictions were not yet final when the law became effective January 1, 2022.' " (*Ibid.*, quoting *People v. Sek* (2022) 74 Cal.App.5th 657, 673.)

Morgan argues that counts 2 and 3 are part of the same course of action as count 1, and that we should on remand direct the trial court to exercise its newly granted discretion as to which of the sentences to stay. Having concluded that the court's implied finding that counts 2 and 3 were not part of the same course of conduct as count 1 was supported by substantial evidence, we reject this argument. Although we have concluded that counts 2 and 3 *were* part of a single act or course of conduct, the trial court imposed identical concurrent terms of two years to those counts. We may refuse to remand a case for resentencing if the record shows that to do so would be futile. (See *People v. Lopez* (2019) 42 Cal.App.5th 337, 342.) Thus, rather than remand, we will modify the judgment to stay the two-year term imposed on count 3.

7. **Morgan's Claim of Error as to the Firearm Enhancement**

Section 12022.53, subdivision (h) allows a trial court to strike a firearm enhancement under that section "in the interest

of justice pursuant to section 1385." Morgan argues that the court erred in imposing a sentence of ten years for the firearm enhancement because he only had one prior non-violent felony conviction and because it had discretion not to impose the charged enhancement under the statute. He argues that the trial court may not have been aware of its sentencing discretion and that we should therefore remand. We are not persuaded.

### 7.1. Additional Background

At the sentencing hearing, counsel for Morgan argued that Morgan was young and did not have a lengthy criminal history, and therefore asked that the court exercise its discretion and not impose the firearm enhancement.

The court recounted the firearm allegations and the jury's findings, then noted "that relatively speaking [Morgan] doesn't have a prior record." The court also observed that his girlfriend had previously spoken on his behalf and that "[h]is mom made some comments today. He made some comments, although all of them weren't necessarily positive."[6] The court also "listened to the points that [Morgan's] attorney has made."

The court then announced its sentence on the firearm enhancement: "[T]he court is now aware that I can exercise my discretion. I no longer have to choose the high term of 25 years pursuant to the (d) subsection. [¶] And the court is going to take into account all the points that have been raised by defense counsel and the fact that [Morgan] doesn't really have that much

---

[6] Referring to Kyle's family, Morgan stated, "I don't care how the family feel. I understand they lost a loved one. But not as far as I caring about how they feel. But what I feel is me being—as being guilty is not it. I'm not guilty of it."

of a record. [¶] So I'm going to impose the 10 years consecutive pursuant to Penal Code section 12022.53(b). [¶] So, again, although the People were asking for 50 years to life as to count 1, the court is going to order that 10 years to be consecutive. So it's going to be 35 years in state prison to life."

### 7.2. Analysis

"[I]n light of the presumption on a silent record that the trial court is aware of the applicable law, including statutory discretion at sentencing, we cannot presume error where the record does not establish on its face that the trial court misunderstood the scope of that discretion." (*People v. Gutierrez* (2009) 174 Cal.App.4th 515, 527.) We find nothing in the record that suggests that the court was not aware that it had discretion under section 12022.53, subdivision (h) to strike the firearm enhancement. In arguing otherwise, Morgan relies on *People v. Lua* (2017) 10 Cal.App.5th 1004. The Court of Appeal in *Lua* found that the record was ambiguous as to whether the trial court understood the scope of its discretion to strike certain drug-related enhancements where the trial court appeared to characterize 17 years as " 'the lowest sentence possible' " even though striking the enhancements would result in a sentence of less than 17 years. (*Id.* at pp. 1021–1022.) There is no comparable statement here. The court acknowledged that it had discretion and that it was not obligated to give the highest sentence. Although it did not explicitly refer to its discretion to strike the enhancement, the court did not indicate that it was trying to give Morgan the lowest sentence possible, or suggest that it would strike the enhancement, as Morgan's attorney requested, if it thought it had the discretion to do so.

81

Thus, we reject Morgan's contention that the court committed error or that we should remand to permit the court to exercise its discretion.

## 8.     Morgan's Custody Credit

The record indicates that Morgan was arrested on May 26, 2018 and sentenced on September 16, 2021. Morgan contends that the court awarded 1,209 days actual presentence custody credit when he was entitled to 1,210 actual days custody credits. The Attorney General concedes that he is correct. We accept this concession.[7]

---

[7] Harrison was arrested and sentenced on the same dates and his amended abstract of judgment reflects a credit for time served of 1,210 days.

## DISPOSITION

Appellant Dean Morgan's judgment is modified to reflect an award of 1,210 days of actual presentence custody credit rather than 1,209 days and that his sentence on count 3 for unlawful possession of ammunition is stayed pursuant to section 654. The trial court shall issue an amended abstract of judgment for Morgan reflecting these modifications. With the exception of these modifications, the judgments are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

LAVIN, J.

WE CONCUR:

EDMON, P. J.

EGERTON, J.

83